**This order is SIGNED.**



**Dated: March 28, 2018**

KEVIN R. ANDERSON
U.S. Bankruptcy Judge

*slo*

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH

| In re:<br><br>THEODORE WILLIAM WHITE, JR.<br>and PORSCHA SHIROMA,<br><br>              Debtors.<br>_____<br><br>J. KEVIN BIRD, an Individual,<br><br>              Plaintiff,<br>vs.<br><br>LYNN E. WARDLEY, an Individual,<br>and AMERICAN BENEFITS<br>COMPANY, INC.,<br><br>              Defendants. | Bankruptcy Number: 14-25727<br><br>Chapter 7<br><br><br><br><br>Adversary Proceeding No. 16-02089<br><br>Hon. Kevin R. Anderson |

**MEMORANDUM DECISION ON LYNN E. WARDLEY'S
MOTION FOR SUMMARY JUDGMENT (DOCKET NO. 58)**

## I.    Introduction

Theodore William White, Jr. ("White" or the "Debtor") and Lynn E. Wardley ("Wardley") were engaged in several business transactions wherein Wardley would advance funds and the Debtor would operate the businesses. Wardley allegedly advanced over $1.5 million toward these ventures, for which the Debtor was allegedly directly or indirectly liable. The loans were generally

evidenced by notes signed by the Debtor. In December 2010, Wardley and the Debtor formed an entity called ABC Club that Wardley would fund and the Debtor would operate. In connection therewith, the Debtor signed a guaranty to repay up to $750,000 of Wardley's advances to ABC Club. During this time, the Debtor's primary asset was a judgment for $15 million. In July of 2011, the Debtor collected on the judgment and immediately made two transfers to Wardley of $750,000 each in payment on the notes, the guaranty, and other loans.

Almost three years later on May 30, 2014, the Debtor and his spouse, Porscha Shiroma ("Shiroma"), filed a voluntary Chapter 7 bankruptcy petition. J. Kevin Bird was appointed as the Chapter 7 Trustee ("Trustee"). On May 30, 2016, the Trustee filed this adversary proceeding against Wardley and American Benefits Company, Inc. The Trustee amended his complaint on September 15, 2017 (the "Complaint").[1] The Complaint seeks to recover the Debtor's allegedly fraudulent transfers to Wardley under 11 U.S.C. §§ 544, 550, and the Utah Uniform Fraudulent Transfer Act ("UUFTA").[2]

The matter before the Court is Wardley's motion for summary judgment, which argues that the Debtor received "reasonably equivalent value in exchange" for the transfers pursuant to Utah Code Ann. §§ 25-6-5(1)(b) and 25-6-6(1)(a).[3] The Court held a hearing on Wardley's motion for summary judgment on January 9, 2018 and a continued hearing on January 17, 2018. The Court has reviewed the briefing, including the exhibits attached to Wardley's motion[4] and the Trustee's memorandum in opposition,[5] and has conducted its own independent research of applicable law.

---

[1] Dkt. No. 46. Hereinafter, all references to the docket will be in Case No. 16-02089 unless otherwise specified.

[2] *Id.*

[3] The Trustee filed the Adversary Proceeding on May 30, 2016. The Court will reference the Utah Uniform Fraudulent Transfer Act using the statute numbering system as it existed on the date that the complaint was filed.

[4] Dkt. No. 58.

[5] Dkt. No. 71.

For the reasons set forth in this memorandum decision, the Court denies in part and grants in part Wardley's motion for summary judgment.

## II.    Jurisdiction and Venue

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334(a) & (b) and 157(b). Wardley's motion for summary judgment is a core proceeding under 28 U.S.C. § 157(b)(2)(H). Venue is appropriate in this District under 28 U.S.C. §§ 1408 and 1409, and notice of the hearing was properly given.

## III.    Undisputed Facts

Wardley's Motion for Summary Judgment centers on whether the Debtor received "reasonably equivalent value in exchange" for the transfers to Wardley. The following factual statements from Wardley's Motion for Summary Judgment,[6] the Debtor's Memorandum in Opposition,[7] and Wardley's Reply[8] are undisputed:[9]

## A.    The Consolidated Note for $600,000 and the $78,000 in Advances

1.    On or about October 1, 2010, White and his wife Shiroma, executed a promissory note (the "First Cascade Note") in the amount of $100,000 payable to Cascade Lending Resources, LLC ("Cascade")—a company Wardley owns and controls.[10]

---

[6] Dkt. No. 58.

[7] Dkt. No. 71.

[8] Dkt. No. 73.

[9] Fact statements that the parties may have lodged objections to, but that the Court determines are not in material dispute are included.

[10] Dkt. No. 58, Ex. C, Decl. of Lynn E. Wardley, ¶ 7; *see id.* Ex. 5, Promissory Note.

2.      On or about October 21, 2010, White and Shiroma executed a promissory note (the "Second Cascade Note") in the amount of $100,000 payable to Cascade—a company Wardley owns and controls.[11]

3.      Pursuant to a subsequent agreement between White and Wardley, which was memorialized in writing, the original principal amount owed under the Second Cascade Note was increased from $100,000 to $200,000.[12]

4.      On or about November 9, 2010, White and Shiroma executed a promissory note (the "Wardley/Brennan Note") in the amount of $100,000 payable to Wardley and Lyle E. Brennan.[13]

5.      On or about December 17, 2010, White and Shiroma executed a promissory note (the "Third Cascade Note") in the amount of $100,000 payable to Cascade—a company Wardley owns and controls.[14]

6.      In connection with and in consideration for the First Cascade Note, the Second Cascade Note, the Third Cascade Note, and the Wardley/Brennan Note, Wardley made the following advances of at least $110,500[15] for White's use and benefit:

     a.      $50,000 check on October 21, 2010;

     b.      $10,000 check on November 23, 2010;

     c.      $10,500 wire transfer on December 14, 2010; and

---

[11] *Id.* ¶ 8; *id.* Ex. 6.

[12] *Id.* ¶ 9; *id.* Ex. 7; *see also* Dkt. No. 58, Ex. B, Dep. of Theodore William White Jr. at p. 193:1-194:14.

[13] Dkt. No. 58, Ex. C, Decl. of Lynn E. Wardley, ¶ 10; *id.* Ex. 8.

[14] Dkt. No. 58, Ex. C, Decl. of Lynn E. Wardley, ¶ 11; *id.* Ex. 9.

[15] The parties dispute whether the following transfers were personal loans from Wardley to the Debtor: (1) $100,000 check made on November 9, 2010; (2) $10,000 wire transfer made on December 2, 2010; and (3) $10,000 wire transfer on December 31, 2010.

        d.      $40,000 check processed on December 17, 2010.

7.      On or about February 19, 2011, White and Shiroma executed a promissory note (the "Consolidated Note") in the amount of $600,000 payable to Wardley.[16]

8.      In consideration for the Consolidated Note, which recognized the benefits of the previous loans made to White and Shiroma, Wardley made the following additional loans for White's personal use and benefit:

        a.      $30,000 wire transfer on February 16, 2011; and

        b.      $20,000 check on February 22, 2011.[17]

9.      Following execution of the Consolidated Note, Wardley personally, and through companies he owned and controlled, continued to advance funds to or for the benefit of White, and Wardley expected to be repaid for the same. These advances included at least $78,000, evidenced through the following transactions:

        a.      $5,000 check processed on April 4, 2011;

        b.      $15,000 wire transfer on April 7, 2011;

        c.      $32,000 wire transfer on April 11, 2011;

        d.      $10,000 check processed on May 5, 2011;

        e.      $1,000 check processed on June 6, 2011; and

        f.      $15,000 wire transfer on June 10, 2011.[18]

---

[16] Dkt. No. 58, Ex. C, Decl. of Lynn E. Wardley, ¶ 13; *id.* Ex. 11.

[17] Dkt. No. 58, Ex. C, Decl. of Lynn E. Wardley, ¶ 14; *id.* Ex. 12. The Trustee disputes that $500,000 was owed on the prior notes.

[18] Dkt. No. 58, Ex. C, Decl. of Lynn E. Wardley, ¶ 15; *id.* Ex. 13. The Trustee disputes Wardley's characterization of these advances as "loans" but does not appear to dispute that the advances occurred.

**B.      The BayHill Note for $100,000**

10.      On October 1, 2010, BayHill Capital Corporation ("BayHill Capital") loaned $75,000 to American One Benefits Company, LLC; Frogboss, LLC; and American Senior Benefits Company (the "American Benefits Entities") in exchange for that certain American One Benefits Company Secured Promissory Note, dated October 1, 2010 (the "BayHill Note") in the principal amount of $100,000.[19]

11.      The term of the BayHill Note expired on November 19, 2010.[20]

12.      Under the BayHill Note, BayHill Capital had the right to foreclose on the American Benefits Entities' business and receive all their assets.[21]

13.      On November 19, 2010, the American Benefits Entities executed that certain Agreement for Assignment and Satisfaction, Through Offset, of Promissory Note (the "Assignment"), by which the American Benefits Entities became obligated to Wardley under the BayHill Note in the principal amount of $100,000.[22]

14.      White has never denied his personal liability under the BayHill Note.[23]

15.      The obligors under the BayHill Note were the American Benefit Entities.[24]

16.      The Debtor did not sign the BayHill Note in his individual capacity.[25]

---

[19] Dkt. No. 58, Ex. C, Decl. of Lynn E. Wardley, ¶ 5; *id.* Ex. 4

[20] Dkt. No. 58, Ex. C, Decl. of Lynn E. Wardley, Ex. 4.

[21] *Id.*; Dep. of Theodore William White Jr., Ex. B p. 203:17-22.

[22] Dkt. No. 58, Ex. C, Decl. of Lynn E. Wardley, ¶ 5; *id.* Ex. 4.

[23] Dkt. No. 58, Dep. of Theodore William White Jr., Ex. B, p. 187:8-188:5, 266:12-23. *See also* Dep. of Lynn E. Wardley p. 38:1-3, Ex. E. ("Ted White asked me for a loan to satisfy the obligation to BayHill. . . . And that's how - why my name - I agreed to do that."); *see also id.* 38:12-19. The Court notes that the Trustee has objected to this fact as irrelevant. However, to the extent that the fact gives some context to the parties' relationship the Court includes it in the undisputed facts section.

[24] Dkt. No. 71, Dep. of Lynn E. Wardley, Ex. B, p. 32:18-25 and 33:1-3 and Ex. 7 (Tr. Appx. 0018–0019 and 0041–0043).

[25] Dkt. No. 58, Decl. of Lynn E. Wardley, Ex. C, ¶ 4 and Ex. 4

C.      **The ABC Club Guaranty of $750,000**

17.     For several months prior to December 2010, White solicited Wardley to invest $4 million in American Benefits Company, a company wholly-owned by White or White's other entities.[26]

18.      While Wardley declined to invest in American Benefits Company, Wardley and White agreed, among other things, that they would form a new entity called "ABC Club LLC" ("ABC Club") that Wardley would fund and White would manage, with Wardley receiving a majority interest and White receiving a minority interest.[27]

19.     In December 2010, and based on their agreement, Wardley began *advancing* funds to ABC Club,[28] and White began to oversee its day-to-day affairs.[29]

20.     On April 7, 2011, White, Wardley, and C. David Hester ("Hester") executed an operating agreement for ABC Club with an effective date of December 6, 2010 (the "Operating Agreement").[30]

21.     The Operating Agreement established the following ownership interests in ABC Club: Wardley 82%; White 15%; and Hester 3%.[31]

---

[26] Dkt. No. 58, Dep. of Dep. of Theodore William White Jr., Ex. B, p. 60:11-23.

[27] *Id.* at p. 212:8-22.

[28] Dkt. No. 58, Decl. of Lynn E. Wardley, Ex. C, ¶ 2; Dep. of Theodore William White Jr., Ex. B, p. 205:3-7. The Trustee disputes Wardley's characterization of the money invested in ABC Club as "loans." Therefore, the language has been modified to reflect the undisputed fact.

[29] Dkt. No. 58, Dep. of Theodore William White Jr., Ex. B, p. 204:23-205:7; Decl. of Lynn E. Wardley, Ex. C, ¶ 3; Executive Employment Agreement dated April 7, 2011, Ex. G.

[30] Dkt. No. 58, Dep. of Theodore William White Jr., Ex. B, p. 56:16-20; *id.* Ex. F.

[31] Dkt. No. 58, Ex. F, Operating Agreement § 6.1; Dep. of Theodore William White Jr., Ex. B, p. 62:5-7.

22.     Between December 2010 and April 2011, Wardley *advanced* at least $518,000 to ABC Club.[32]

23.     White believed the value of ABC Club was going to be "millions of dollars."[33]

24.     In the Operating Agreement, White agreed to guarantee the repayment of funds *advanced* by Wardley to ABC Club up to $750,000 (the "Guaranty" or "ABC Guaranty"):

> The members acknowledge that Lynn Wardley has lent and may, in his discretion, lend cash to [ABC Club]. The Members anticipate that [ABC Club] will make profits in its business in sufficient amount to repay in full the amounts loaned by Mr. Wardley to [ABC Club] with interest thereon at the agreed rate. Further, [White] acknowledges the personal benefit Mr. Wardley's organization and capitalization of [ABC Club] has provided to Mr. White in the form of his employment by and promotional ownership interest in [ABC Club]. Accordingly, Mr. White hereby personally guarantees the repayment of the full amount of Mr. Wardley's loans up to $750,000 such that to the extent the Company's cash distributions to Mr. Wardley during the first twelve (12) months of the Company's operations (commencing with the first commercial shipment of the card) do not total the amount owed on the loans he has made, Mr. White shall pay Mr. Wardley personally the shortfall. This is an irrevocable and unconditional promise to pay and not a guarantee of [ABC Club's] performance. The calculation of any amount for which Mr. White may be liable to Mr. Wardley shall be made by the Company's accountant at the time the Company ceases operations and dissolves.[34]

25.     As part of the Guaranty, White also assigned his interest in a $15 million judgment to Wardley:

> Mr. White holds a judgment in litigation captioned Theodore W. White, Jr. v. Richard McKinley, Case No. 05-203-CV-W-NKL, U.S. District Court for the Western District of Missouri, Western Division. Mr. White hereby partially assigns his interest in such judgment to Mr. Wardley to secure the

---

[32] Dkt. No. 58, Ex. C, Decl. of Lynn E. Wardley, ¶ 2. Again, the Trustee disputes Wardley's characterization of the money invested in ABC Club as "loans." Therefore, the language has been modified to reflect the undisputed fact.

[33] Dkt. No. 58, Dep. of Theodore William White Jr., Ex. B, p. 62:5-11.

[34] Dkt. No. 58, Ex. F, Operating Agreement § 6.7; Dep. of Theodore William White Jr., Ex. B, p. 62:5-11.

foregoing personal guaranty, and shall cause his attorneys in that litigation, Brian F. McCallister of the McCallister Law Firm, Kansas City, Missouri, to confirm such judgment and acknowledge this partial assignment and agree to distribute such sum upon demand from net proceeds payable to Mr. White from amounts collected on such judgment, subject to prior claims, in satisfaction of such personal guarantee.[35]

26.     In connection with the Operating Agreement, Wardley and White also signed an Executive Employment Agreement wherein ABC Club employed White "to provide executive services in charge of product development and marketing."[36]

27.     White testified, "I was working for ABC Club taking a draw on something I had to pay back dollar for dollar at $20,000 a month."[37]

28.     From January 2011 through September 2011, ABC Club paid White at least $235,000 in compensation, amounting to an average of approximately $26,000 a month.[38]

29.     For the period beginning on December 16, 2010 through July 8, 2011, and at White's request, Wardley *advanced* $868,000 to ABC Club.[39]

30.     The *transfers* made to ABC Club are evidenced by the following transactions:

a.     $30,000 check deposited on December 16, 2010;

b.     $29,000 check deposited on January 12, 2011;

c.     $19,000 check deposited on January 13, 2011;

d.     $200,000 transfer on January 13, 2011;

e.     $40,000 transfer on February 3, 2011;

[35] Dkt. No. 58, Ex. F, Operating Agreement § 6.7.

[36] Dkt. No.58, Executive Employment Agreement dated April 7, 2011, Ex. G.

[37] Dkt. No. 58, Dep. of Theodore William White Jr., Ex. B, p. 70:11-14.

[38] Dkt. No. 58, Decl. of Lynn E. Wardley, Ex. C, ABC Club Ledger, Ex. 2.

[39] Dkt. No. 58, Decl. of Lynn E. Wardley, Ex. C, ¶ 2. Again, the Trustee disputes Wardley's characterization of the money invested in ABC Club as "loans." Therefore, the language has been modified to reflect the undisputed fact.

f.      $50,000 transfer on February 15, 2011;

g.      $50,000 transfer on March 3, 2011;

h.      $50,000 transfer on March 11, 2011;

i.      $50,000 transfer on March 31, 2011;

j.      $50,000 check deposited on April 13, 2011;

k.      $50,000 check deposited on May 9, 2011;

l.      $50,000 check deposited on May 23, 2011;

m.      $100,000 transfer on June 13, 2011;

n.      $50,000 transfer on July 5, 2011; and

o.      $50,000 transfer on July 8, 2011.[40]

31.     White knew he was obligated to repay his liability under the Guaranty, and he did so in July 2011.[41]

32.     White was working for ABC Club during the period that Wardley was making the alleged $78,000 in undocumented personal loans to White, and during this same time, Wardley was financially supporting ABC Club's operations.[42]

33.     White's job with ABC Club was not guaranteed, and ABC Club could terminate White's employment at will with 30 days' notice.[43]

---

[40] Dkt. No. 58, Decl. of Lynn E. Wardley, Ex. C, ¶ 2; *id.* Ex. 1; Dkt. No. 46, Am. Compl. ¶ 31; Dkt. No. 48, Ans. to Am. Compl. ¶ 31. Again, the Trustee disputes Wardley's characterization of the money invested in ABC Club as "loans." Therefore, the language has been modified to reflect the undisputed fact.

[41] Dkt. No. 58, Dep. of Theodore William White Jr., Ex. B, p. 165:9-14; 166:12-13, 187:18-188:3; *see also* Decl. of Lynn E. Wardley, Ex. C, ¶¶ 16-19. The Court notes that the Trustee has objected to this fact as irrelevant. However, to the extent that the fact gives some context to the parties' relationship the Court has decided to include this fact in the undisputed facts section.

[42] Dkt. No. 71, Dep. of Lynn E. Wardley, Ex. A, p. 80:25–81:1–2 and 82:7–10 (Tr. Appx. 0035–0037); Dkt. No. 71, Dep. of Theodore W. White Jr, Ex. C, p. 70:11–17 and 209:7–210:25 (Tr. Appx. 0064 and 0078–0079).

[43] Dkt. No. 58, Ex. G, Executive Employment Agreement dated April 7, 2011, ¶ 2.

34.     When the Second $750,000 Transfer was made, ABC Club was still operating, but it ceased operations some time thereafter. It has yet to be dissolved.[44]

35.     Wardley's alleged loans to ABC Club were undocumented and had no maturity date, no interest rate, and no terms for repayment.[45]

36.     Wardley's general practice was to have a promissory note evidencing every loan he made.[46]

37.     Wardley did not keep track of what he "loaned" to ABC Club and had to rely on others to tell him.[47]

38.     White's Guaranty of Wardley's advances to ABC Club was to be reduced by "cash distributions" from ABC Club to Wardley.[48]

**D.      White's $15 Million Judgment**

39.     In August 2008, following a trial on certain causes of action White had filed against Richard McKinley ("McKinley"), a judgment was entered in White's favor on a general verdict for $14,000,000 and punitive damages for $1,000,000 (the "Judgment").[49]

40.     McKinley appealed the Judgment, and the Eighth Circuit Court of Appeals affirmed the verdict on July 2010.[50]

---

[44] Dkt. No. 71, Dep. of Lynn E. Wardley, Ex. B, p. 85:3–12 (Tr. Appx. 0038); *see also* Dep. of Theodore W. White, Jr., Ex. C, p. 162:22–24 (Tr. Appx. 0074).

[45] Dkt. No. 71, Exam. of Lynn E. Wardley, Ex. A, p. 59:20–60:1–13 (Tr. Appx. 0006–0007).

[46] Dkt. No. 71, Exam. of Lynn E. Wardley, Ex. A, p. 44:5–7 (Tr. Appx. 0003).

[47] Dkt. No. 71, Dep. of Lynn E. Wardley, Ex. B, p. 62:4-65:1 (Tr. Appx. 0030–0031).

[48] Dkt. No. 71, Ex. B, Operating Agreement §§ 6.5 and 6.7 (Tr. Appx. 00135 and 0137).

[49] Dkt. No. 58, Ex. A, Mutual Release and Settlement Agreement dated July 22, 2011, p. 2.

[50] *Id.*

41.     On or about July 22, 2011, following a mediation, the City of Lee's Summit ("Lee's Summit") agreed to indemnify McKinley for the Judgment, and White and Lee's Summit reached a settlement (the "Settlement").[51]

42.     Pursuant to the Settlement, Lee's Summit agreed to pay White $15.5 million in satisfaction of the general damages portion of the Judgment.[52]

## E.     White's Transfer of the Judgment Proceeds to Wardley

43.     On or about July 22, 2011, at White's direction, and based on previous agreements between White and Wardley (discussed below), Lee's Summit wired $750,000 of the Settlement proceeds directly to Wardley (the "First $750,000 Transfer").[53]

44.     A few days later, on or about July 25, 2011, White transferred another $750,000 of the Settlement proceeds to Wardley (the "Second $750,000 Transfer").[54]

45.     White testified that he paid Wardley because he "believed" he owed Wardley the amounts he paid him.[55]

## IV.     SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(a), as incorporated into bankruptcy proceedings by Fed. R. Bankr. P. 7056, the Court is required to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[51] *Id.* at p. 1, 3.

[52] *Id.* at p. 4.

[53] *See* Dkt. No. 46, ¶13; Dkt. No. 48, ¶13.

[54] *See* Dkt. No. 46, ¶14; Dkt. No. 48, ¶14.

[55] Dkt. No. 58, Ex. B, Dep. of Theodore William White Jr. at p. 166:12-13 ("I just knew that I wanted to pay Lynn because I promised I would pay him, and I did."); *Id.* at p. 188:2-3 ("If I didn't believe I owed it, I wouldn't have paid it."). The Trustee's objection to this statement argues that it is largely irrelevant and immaterial to the reasonably equivalent value question. However, to the extent that the fact gives some context to the parties' relationship the Court includes this fact in the undisputed facts section.

Substantive law determines which facts are material and which are not. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[56] Whether a dispute is "genuine" turns on whether "the evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party."[57] In sum, the Court's function at the summary judgment stage is to "determine whether there is a genuine issue for trial."[58]

The moving party bears the burden to show that it is entitled to summary judgment,[59] including the burden to properly support its summary judgment motion as required by Rule 56(c).[60] If the moving party has failed to meet its burden, "summary judgment must be denied," and the nonmoving party need not respond because "no defense to an insufficient showing is required."[61] Once the moving party meets its initial burden, "the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."[62] The nonmoving party may not rely solely on allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial."[63]

---

[56] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[57] *Id.*

[58] *Id.* at 249.

[59] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[60] *Murray v. City of Tahlequah, Okla.*, 312 F.3d 1196, 1200 (10th Cir. 2002).

[61] *Reed v. Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002) (citation omitted)

[62] *Concrete Works of Colorado, Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994).

[63] *Celotex*, 477 U.S. at 324.

When considering a motion for summary judgment, the Court views the record in the light most favorable to the non-moving party,[64] but the Court does not weigh the evidence or make credibility determinations.[65]

## V.    UTAH UNIFORM FRAUDULENT TRANSFER ACT

The Trustee's Complaint[66] asserts three causes of action under the UUFTA:

*First Claim for Relief*: Avoidance and recovery of the Debtor's first transfer of $750,000 to Wardley to the extent of $150,000 under the UUFTA §§ 25-6-5, 25-6-6, and 11 U.S.C. §§ 544(b), 550;

*Second Claim for Relief*: Avoidance of the Debtor's Guaranty under the UUFTA §§ 25-6-5, 25-6-6, and 11 U.S.C. § 544(b); and

*Third Claim for Relief*: Avoidance of the Debtor's second transfer of $750,000 to Wardley under UUFTA § 25-6-5, 25-6-6, and 11 U.S.C. §§ 544(b), 550.

To prevail on a cause of action under UUFTA § 25-6-6(1), the plaintiff must prove four elements: (1) a transfer by the debtor; (2) a debt owed to the creditor that preceded the transfer; (3) that the debtor did not receive a reasonably equivalent value in exchange for the transfer or obligation; and (4) the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer.[67] Wardley's Motion for Summary Judgment focuses on the third element of

---

[64] *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1279 (10th Cir. 2013) (citation omitted).

[65] *Nat'l Am. Ins. Co. v. Am. Re–Insurance Co.*, 358 F.3d 736, 742–43 (10th Cir. 2004) (citing *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 533 (10th Cir. 1994)).

[66] Dkt. No. 46.

[67] Utah Code Ann. §§ 25-6-6(1)(a) and 25-6-5(b)(1). The Trustee's Amended Complaint cites to both Utah Code Ann. § 25-6-5 and 25-6-6. *See Amended Complaint, Dkt. No. 46*. However, Wardley argues in the Motion for Summary Judgment that § 25-6-5 requires a showing of "actual intent to hinder, delay, or defraud any creditor of the debtor" and requests dismissal of the claim under this section of the UUFTA for failure "to state a claim on which relief can be premised." *See Wardley's Motion for Summary Judgment, Dkt. No. 58, p. 3, n.1.* A motion to dismiss for failure to state a claim is not properly before the Court. Furthermore, because Wardley's Motion for Summary Judgment does not argue the elements of U.C.A. § 25-6-5 the Court will not address it in this decision and instead focuses on the "reasonably equivalent value" element of Utah Code Ann. § 25-6-6.

UUFTA § 25-6-6(1) and argues that the Debtor received reasonably equivalent value in exchange for the transfers to Wardley.

Determining whether the Debtor received "reasonably equivalent value" under the UUFTA is a two-step analysis.[68] First, the Court must look to whether Wardley provided "value" to the Debtor.[69] The second step is to determine whether the Debtor received "reasonably equivalent" value within the meaning of the statute.[70]

As to the meaning of "value," UUFTA § 25-6-4 provides that "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied." "'Value' is to be determined in light of the purpose of the Act to protect a debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors. Consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition."[71]

Wardley asserts that the Debtor's $1.5 million in transfers to him were in satisfaction of antecedent debts – three notes and various personal loans. For ease of reference, the notes and loans are identified below in chronological order:

1.    The BayHill Note ($100,000)[72]

---

[68] *Klein v. Michelle Tuprin & Assoc., P.C.*, No. 2:14-cv-00302-RJS-PMW, 2016 WL 3661226, at *7 (D. Utah July 5, 2016).

[69] *Id.*

[70] *Id.*

[71] Uniform Fraudulent Transfer Act § 3 cmt. (2).

[72] There is a dispute as to whether Wardley bought or simply paid off the original BayHill Note. Nonetheless, it is undisputed that at White's behest, Wardley paid money to BayHill to prevent it from executing against the assets of White's American Benefits Entities. Thus, Wardley asserts that White's payment of $1.5 million was in satisfaction of this obligation.

2.    The Consolidated Note ($600,000)[73]

3.    The ABC Guaranty ($750,000)

4.    Personal Loans ($78,000)

Wardley contends that White received reasonably equivalent value in exchange for the transfers. The core issue in each category of obligations is whether White was legally obligated to repay Wardley under a valid, antecedent debt.[74] The Court will examine each category of alleged obligations in turn.

## VI.    ANALYSIS

### A.    The BayHill Note for $100,000

Based upon the relevant undisputed facts,[75] the Court finds a genuine dispute of material fact as to whether White was individually liable to repay Wardley under the BayHill Note and therefore, whether White received reasonably equivalent value when he transferred funds to Wardley in July of 2011.

Wardley relies on White's testimony that "he never denied personal liability under the BayHill Note."[76] However, White's understanding as to his personal liability directly contradicts the BayHill Note itself. It is undisputed that the obligors under the BayHill Note were the American Benefit entities.[77] Furthermore, the BayHill Note is not signed by White in his personal capacity,

---

[73] Wardley and White consolidated various prior loans into a single note in the amount of $600,000. Wardley asserts that White's payment of $1.5 million was in satisfaction of this obligation. The Trustee's first claim for relief in the Amended Complaint seeks the "avoidance and recovery of the First $750,000 Transfer to the extent of $150,000."

[74] *Klein v. Michelle Tuprin & Assoc., P.C.*, No. 2:14-cv-00302-RJS-PMW, 2016 WL 3661226, at *7 (D. Utah July 5, 2016).

[75] The undisputed facts relevant to the BayHill Note are set forth in Part II.B, ¶¶ 10-16.

[76] *Supra* Part II.B, ¶ 14.

[77] *Supra* Part II.B, ¶ 15.

but rather as the CEO of American One Benefits Company, LLC, American Senior Benefits Company, and FrogBoss LLC.[78]

A corporate signatory to a note is generally personally liable unless "the signer's corporate capacity [is] clear from the form of signature."[79] "Individuals who fail to limit their signatures to their corporate capacity have consistently been held to be directly liable on corporate instruments."[80] Therefore, based upon the BayHill Note itself and the undisputed facts related thereto, White did not have personal liability on the BayHill Note.

Wardley contends that even if White did not personally obligate himself to repay the BayHill Note, the Trustee's expert accountant prepared a report showing an 80% probability of contingency between White and his various business entities.[81] However, there are no undisputed facts as to this argument, and a determination of whether, under a veil-piercing theory, White should be held liable for the debts of the American Benefits Entities is an issue more appropriate for trial.

The undisputed facts, including that White did not sign the BayHill Note in a personal capacity despite "never denying" personal liability, create a genuine dispute of material fact as to whether White was legally obligated to repay Wardley under the BayHill Note. Thus, the Court

---

[78] *Supra* Part II.B, ¶ 16.

[79] *DBL Distributing, Inc. v. 1 Cache, L.L.C.*, 147 P.3d 478, 481 (Utah Ct. App. 2006) (citing *Boise Cascade Corp. v. Stonewood Dev. Corp.*, 655 P.2d 668, 668 n.1 (Utah 1982)).

[80] *Id.* (citing *Bushnell Real Estate, Inc. v. Nielson*, 672 P.2d 746, 751–52 (Utah 1983) (holding corporate officers liable on promissory note where they failed to signify their corporate capacity in their signatures); *Anderson v. Gardner*, 647 P.2d 3, 4–5 (Utah 1982) (holding that where it is not clear that a corporate officer signs a contract in a representative capacity, he is personally liable); *Sterling Press v. Pettit*, 580 P.2d 599, 600–01 (Utah 1978) (holding individuals liable on purported corporate check signed without corporate titles and using unregistered corporate name); *Starley v. Deseret Foods Corp.*, 93 Utah 577, 74 P.2d 1221, 1223–25 (1938) (affirming action on note against corporate secretary who signed corporate promissory note without adding word "Secretary" next to signature)).

[81] Dkt. No. 58, Ex. H, Expert Report of Barbara Smith, *Solvency Analysis*, dated Sept. 18, 2017, pp. 23-24; Ex. I, Dep. of Barbara M. Smith, pp. 83:7-12, 100:18-22; 101:13-19 ("The probability that [White] will have to pay business debts is 80 percent.").

denies Wardley's summary judgment motion as to whether White received reasonably equivalent value for his payment to Wardley on the BayHill Note.

## B.    The Consolidated Note for $600,000

The parties do not dispute that Wardley, White, and Shiroma executed a series of promissory notes between October 2010 and December 2010, and that they subsequently executed the Consolidated Note in February 2011.[82] The Trustee's Complaint does not seek to recover White's payment of $600,000 to Wardley under the Consolidated Note. It is only in the response to Wardley's Motion for Summary Judgment that the Trustee first argues that the $600,000, or some portion thereof, was not an antecedent debt of White under the Consolidated Note.

It is inappropriate to consider a new legal theory set forth in a response to summary judgment where such theory was not pleaded in a complaint.[83] The Court declines to consider the Trustee's argument as to White's liability under the Consolidated Note because the Complaint did not contest White's liability or seek to avoid payments made under the Consolidated Note. The Complaint provides that "White only owed $600,000 (which was the principal amount of the Notes) and had no personal liability for alleged personal loans not included within the Notes."[84] Further, the Complaint provides that "[u]nder 11 U.S.C. § 544(b) and standing in the shoes of such creditors, the Trustee may similarly avoid the First $750,000 Transfer to the extent of $150,000 for the benefit of the bankruptcy estate."[85] "These creditors could avoid the First $750,000 Transfer

---

[82] *Supra* Part II.A, ¶1-9.

[83] *Holmes Development, LLC v. Cook*, 48 P.3d 895, 904 (Utah 2002) ("A plaintiff cannot amend the complaint by raising novel claims or theories for recovery in a memorandum in opposition to a motion to dismiss or for summary judgment . . . because such amendment fails to satisfy Utah's pleading requirements.") (citations omitted).

[84] Dkt. No. 46, Amended Complaint, ¶ 43(a).

[85] Dkt. No. 46, Amended Complaint, ¶ 47.

to extent of $150,000 under the Utah Uniform Fraudulent Transfer Act."[86] At oral argument, Trustee's counsel confirmed the Complaint's admission that White owed $600,000 under the Consolidated Notes as a valid and enforceable debt.[87] For these reasons, the Court will not consider the Trustee's argument that the Consolidated Note was not an antecedent debt, or that White did not receive reasonably equivalent value in exchange for the transfer of $600,000 to Wardley on the Consolidated Note.

## C.    The Personal Advances for $78,000.

The parties do not dispute that following the execution of the Consolidated Note, Wardley personally, and through companies he owned and controlled, continued to advance funds to or for the benefit of White, and Wardley expected to be repaid for the same.[88] These "personal advances" included at least $78,000, transferred from Wardley to White between April and June 2011.[89] The personal advances are not evidenced by written documentation. Further, the parties do not dispute that White was working for ABC Club at the time of the $78,000 in personal advances, and Wardley was financially supporting ABC Club's operations.[90]

Wardley asserts that the Trustee admitted that Wardley advanced $78,000 to White in the Complaint. Wardley is correct. The Complaint states that "[b]etween October 1, 2010, and June 10, 2011, Wardley . . . transferred the following amounts to White . . . ."[91] The Complaint goes on

---

[86] Dkt. No. 46, Amended Complaint, ¶ 46.

[87] January 9, 2018 hearing at 10:50:25 a.m. to 10:50:54 a.m. ("The complaint assumes $600,000 owed on those promissory notes, and that that is a valid and enforceable debt. After the $600,000, you have Mr. Wardley claiming that another $178,000 is owed or was owed at the time and was paid by Mr. White. In other words, he paid that additional debt.")

[88] *Supra*, Part II.A, ¶9.

[89] The undisputed facts relevant to the personal advances of $78,000 are set forth in Part II.A., ¶9.

[90] *Supra*, Part II.C, ¶32.

[91] Dkt. No. 46, Amended Complaint, ¶ 17.

to state, "Wardley asserts that each of these transfers was a personal loan to White."[92] Thus, while the Complaint acknowledges that the transfers occurred, the Complaint does not admit that these transfers were personal loans and does not admit any legally cognizable obligation by White to repay the transferred funds to Wardley.

The Court finds that the undisputed facts – including testimony from White and Wardley as to their general practice of documenting loans between them[93] and that White was working for ABC Club when the personal advances were transferred – create a genuine and material dispute as to whether these advances were intended to be personal loans, business loans to ABC Club, or advances on White's salary from ABC Club. The Court determines that further evidence is necessary regarding the parties' intention and understanding with respect to these personal advances.

**D.      The ABC Club Guaranty for $750,000**

Based on the relevant undisputed facts,[94] and for the reasons set forth below, the Court finds that White received reasonably equivalent value for the transfers made in satisfaction of the ABC Guaranty.

### 1.      Relevant Undisputed Facts

The following undisputed facts are particularly relevant to the Court's analysis of the ABC Club Guaranty. In the months prior to December 2010, the Debtor solicited Wardley to invest $4 million in American Benefits Company, a company owned by the Debtor or other entities owned by the Debtor. Wardley declined to invest in American Benefits Company, but in the alternative,

---

[92] *Id.* at ¶ 18.

[93] *Supra* Part II.C, ¶36.

[94] *Supra* Part II.C, ¶¶17-38.

he agreed to fund a new entity called ABC Club that would be run by the Debtor with Wardley holding an 85% interest and the Debtor holding a 15% interest.[95]

The parties dispute whether the Debtor agreed at this time to personally guarantee the repayment of any funds advanced by Wardley to ABC Club.[96] The Court concurs with the Trustee that under the Utah Statute of Frauds, a "promise to answer for the debt … of another" is unenforceable unless in writing (U.C.A. § 25-5-4). [97]

Nonetheless, it is undisputed that starting in December 2010, Wardley began transferring funds to ABC Club while the Debtor began to run its day-to-day affairs. It is undisputed that between December 2010 and April 2011, Wardley transferred at least $518,000 to ABC Club.[98] It is also undisputed that on April 7, 2011, the Debtor and Wardley signed the Operating Agreement of ABC Club, LLC (the "ABC Operating Agreement").[99]

On its face, the ABC Operating Agreement states that it is "Effective December 6, 2010," which is consistent with the parties' testimony as to their discussions in December of 2010 regarding the formation of ABC Club.[100]

Paragraph 6.7 of the ABC Operating Agreement states:

Accordingly, Mr. White hereby personally guarantees the repayment of the full amount of Mr. Wardley's loans, up to $750,000, such that to the extent the Company's cash distributions to Mr. Wardley during the first twelve (12) months of the Company's operations (commencing with the first commercial shipment of

---

[95] *Supra* Part II.C, ¶21.
[96] Dkt. No. 71, p. 12, ¶28.
[97] *Id*.
[98] *Supra* Part II.C, ¶22.
[99] *Supra* Part II.C, ¶20.
[100] *Supra* Part II.C, ¶19-20.

the card) do not total the amount owed on the loans he has made, Mr. White shall pay Mr. Wardley personally the shortfall."[101]

### 2.      The Court Assumes the Guaranty is Not a Voidable Obligation.

Wardley's motion seeks a summary judgment ruling that White received reasonably equivalent value for the $750,000 transfer to Wardley because it satisfied the antecedent debt of the ABC Guaranty. However, the Trustee's Complaint also seeks to avoid the ABC Guaranty obligation as a fraudulent transfer,[102] but this issue is not presently before the Court. Therefore, for purposes of this summary judgment motion, the Court will assume that the Guaranty obligation is not avoidable.

### 3.      Capital Contributions vs. Loans

The Trustee argues that the Court cannot grant summary judgment because Wardley's transfers to ABC Club should be recharacterized as capital contributions rather than loans; thus, there was no antecedent debt associated with the $750,000 transfer. The Court disagrees. First, the Trustee did not assert a cause of action for recharacterization in the Complaint, and second, the Operating Agreement controls as to the parties' rights and responsibilities as to capital contributions and the Guaranty. Lastly, even if recharacterization were properly pleaded in the Complaint, the Court is unconvinced that the undisputed facts support an exercise of the Court's equitable powers to restructure the parties' business relationship.

#### a)      *The Trustee's Complaint Did Not Assert a Cause of Action for the Recharacterization of Loans to Equity*

First, the Trustee's Complaint did not assert a cause of action for the recharacterization of Wardley's loans to ABC Club as equity. Actions for the recharacterization of debt to equity are

---

[101] *Supra* Part II.C, ¶24.
[102] Dkt. No. 46, ¶49-55.

generally asserted to subordinate insider claims and are brought as a separate cause of action under

11 U.S.C. § 510 or in an objection to a proof of claim under 11 U.S.C. § 502. Even in cases where

a trustee argues for the recharacterization of a debt to equity in connection with a fraudulent

transfer action, it is pleaded as a separate cause of action in the complaint so that the defendant

can respond and defend the allegations of recharacterization.[103]

In this case, the Trustee's Complaint does not contain a cause of action for

recharacterization of Wardley's debt to equity. The Tenth Circuit considers thirteen factors in

distinguishing true debt from camouflaged equity.[104] Because the Trustee did not raise a claim for

recharacterization in the complaint, Wardley has not had the opportunity to respond or otherwise

defend as to these factors. The Trustee raised the issue of recharacterization for the first time in his

response to Wardley's motion for summary judgment, which is procedurally problematic.[105] At

this point in the proceedings, it is simply too little, too late, and too prejudicial to Wardley to

require him to respond and defend a claim for recharacterization.

### b) *The Operating Agreement Controls*

Second, in determining the parties' intent and the legal effect of an unambiguous contract,

a court should confine its analysis to the text of the contract.[106] Only if the language at issue is

---

[103] *See Official Comm. of Unsecured Creditors v. Hancock Park Capital II, L.P. (In re Fitness Holdings Int'l, Inc.)*, 714 F.3d 1141, n.4 (9th Cir. 2013) (The trustee's complaint contained a separate cause of action for the recharacterization of defendant's claim from debt to equity for purposes of establishing the absence of an antecedent debt and thereby prevail on a fraudulent transfer action.); *Gladstone v. McHaffie (In re UC Lofts on 4th, LLC)*, 2014 Bankr. LEXIS 1404, at *71 (Bankr. S.D. Cal. March 27, 2014) (a separate cause of action for recharacterization was included in complaint to recover fraudulent transfer). *See also Brookview Apts., L.L.C. v. Bronson Family Trust (In re Know Weigh, L.L.C.)*, 576 B.R. 189, 198 (Bankr. C.D. Cal. 2017); *The Responsible Person of Musicland Holding Corp. v. Best Buy Co., Inc. (In re Musicland Holding Corp.)*, 398 B.R. 761, 775 (Bankr. S.D.N.Y. 2008).

[104] *Sender v. Bronze Group, Ltd. (In re Hedged-Investments Assocs., Inc.)*, 380 F.3d 1292, 1298 (10th Cir. 2004).

[105] *Holmes Development, LLC v. Cook*, 48 P.3d 895, 904 (Utah 2002).

[106] *Glenn v. Reese*, 225 P.3d 185, 188-89 (Utah 2009) (When a contract's language is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law.).

reasonably susceptible to varying interpretations should the court look outside the contract's four-corners.[107] In this case, the guaranty and capital account provisions of the Operating Agreement are clear and unambiguous as to their purpose, meaning, and execution.

For example, Article VI of the Operating Agreement titled "Contributions; Allocation of Profits and Losses; Distributions" consists of almost five pages of single-space text. This Article contains the following paragraphs:

6.1    Contributions (which identifies the initial capital contributions of the parties and their respective ownership interests);

6.2    Maintenance and Determination of Capital Accounts;

6.3    Additional Contributions/Member Loans;

6.4    Allocations (of profits and losses);

6.5    Distributions of Cash;

6.6    Compensation; and

6.7    Guaranteed Loan Repayment.

Further, The Operating Agreement provides for member loans to ABC Club, and specifically references Wardley's prior and possibly future loans to the company.[108] Paragraph 6.7 of the Operating Agreement details the basis for the Guaranty, the amount of the Guaranty, and the three options for satisfying the Guaranty: (1) from company profits; (2) from the Debtor directly if ABC Club failed to generate sufficient profits after twelve months; or (3) from any proceeds the Debtor was entitled to receive from the Judgment.[109]

The Court has reviewed these provisions in the Operating Agreement and finds them to be unambiguous as to how the parties would maintain or increase their capital accounts, and the

---

[107] *Id.*

[108] Dkt. No. 58, Operating Agreement, Ex. F, ¶¶ 6.4(b)(i); 6.5(a)(ii); 6.7.

[109] *Id.* at ¶6.7.

allocations of profits and losses, including a detailed allocation of "distributable cash" as to Wardley and White.[110] Further, there is nothing in the undisputed, or even disputed facts, suggesting that the creation, funding, and operation of ABC Club was anything less than a legitimate, if not overly optimistic, business enterprise that both parties anticipated would generate significant profits. In the confines of this motion for summary judgment, there is nothing to suggest fraud or bad faith in the execution or carrying out of the Operating Agreement.

Therefore, because the Operating Agreement is unambiguous, there is no basis to look outside its four corners to determine the rights and responsibilities of Wardley and White both as to their capital accounts and to the Guaranty.

### c)    *Recharacterization of the Debt is Not Appropriate*

Third, recharacterization of Wardley's loans to equity is not appropriate under these facts. The Trustee cites to *In re Hedged-Investments Assocs.*[111] in support of his argument that the bankruptcy court should exercise its equitable powers to ignore the terms of the Operating Agreement and recharacterize Wardley's loans as capital contributions in order to prevail on his fraudulent transfer action. *Hedged-Investments* references the Tenth Circuit's previous case on recharacterization, *In re Mid-Town Produce Terminal, Inc.*[112] The more recent Tenth Circuit case on recharacterization is *In re Alternate Fuels, Inc.*,[113] which cites to both *Hedged Investments* and *Mid-Town*. The Court has reviewed these three Tenth Circuit cases and notes that none of them arose within the framework of a fraudulent transfer action. Rather, they involved a bankruptcy

---

[110] *Id.* at ¶6.5(a)(i)-(ii).

[111] *Sender v. Bronze Group, Ltd. (In re Hedged-Inv. Assocs.)*, 380 F.3d 1292 (10th Cir. 2004).

[112] 599 F.2d 389, 393-94 (10th Cir. 1979).

[113] *Redmond v. Jenkins (In re Alternate Fuels, Inc.)*, 789 F.3d 1139 (10th Cir. 2015).

action to subordinate the claims of insiders to those of general creditors. As stated in the *In re*

*Alternate Fuels, Inc.* case:

> The practical effect of recharacterizing a putative debt claim as an equity interest is subordination, since a corporation repays capital contributions only if and when it has satisfied all other obligations. In this way, recharacterization ensures that "controlling equity owners of a troubled corporation [do not] jump the line of the bankruptcy process and thwart the company's outside creditors' and investors' priority rights."[114]

Further, the Tenth Circuit found that recharacterization does not eliminate a claim but only

changes its priority of payment:

> Unlike disallowance of a claim, recharacterization of a loan as equity does not ultimately relieve a debtor from his obligation to repay the claimant. Although the claimant may not proceed in bankruptcy—since he no longer holds an allowed "claim"—he may still hold a valid interest in equity to be paid upon satisfaction of the debtor's other outstanding obligations.[115]

It is true that in the setting of a complex fraudulent transfer scheme, bankruptcy courts will

collapse multiple transactions to focus on their substance over form.[116] However, this is not such a

case.

Here, the parties' transactions were simple and straightforward. Wardley was to provide

the funding, and the Debtor was to provide the know-how to make ABC Club a success, with both

parties anticipating sufficient profits to both repay Wardley's loans and to generate a significant

---

[114] *Id.* at 1147 (citations omitted).

[115] *Id.* at 1148. *See also* COLLIER ON BANKRUPTCY ¶ 510.02[3] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev. 2017) ("Typically, recharacterization occurs when an equity holder asserts a claim based on a 'loan' made by the equity holder to the debtor company at a time when the debtor company is in such a poor financial condition that other lenders would not have made such a loan.").

[116] *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In re Sunbeam Corp.)*, 284 B.R. 355, 370 (Bankr. S.D. N.Y. 2002) ("Courts have 'collapsed' a series of transactions into one transaction when it appears that despite the formal structure erected and the labels attached, the segments, in reality, comprise a single integrated scheme when evaluated focusing on the knowledge and intent of the parties involved in the transaction.").

return.[117] To reallocate the risk of loss, and based on White's acknowledged benefit[118] of receiving

lucrative employment[119] and a desired business opportunity through Wardley's funding of ABC

Club,[120] White agreed to guarantee the repayment of Wardley's loans. These facts do not support

or justify an exercise of the Court's equitable powers to restructure the parties' business

relationship in the way the Trustee would like it to be versus what the parties intended it to be.

Therefore, the Court finds that Wardley's transfers to ABC Club were not capital contributions but

"loans" for purposes of the Guaranty.

### 4.    Debtor's Liability under the Guaranty

The next issue is whether the Guaranty created an antecedent debt; meaning, did Wardley

have a legally cognizable, state-law claim against White for payment under the Guaranty.[121]

### a)    *The Two Contingencies*

The Trustee argues that the Guaranty contains two contingencies that had not occurred at

the time of the transfers; thus, the Guaranty did not constitute an antecedent debt. The Trustee

relies on the following language in the Operating Agreement:

> To the extent the Company's cash distributions to Mr. Wardley during the first
> twelve (12) months of the Company's operations (commencing with the first
> commercial shipment of the card) do not total the amount owed on the loans he has
> made, Mr. White shall pay Mr. Wardley personally the shortfall.
> . . .

---

[117] *Supra*, Part II.C, ¶23, 26.

[118] Dkt. No. 58, Ex. F, Operating Agreement, ¶ 6.7 ("Ted White acknowledges the personal benefit Mr. Wardley's organization and capitalization of the Company has provided to Mr. White in the form of his employment by and promotional ownership interest in the Company.").

[119] *Supra*, Part II.C, ¶26.

[120] *Supra*, Part II.C, ¶27.

[121] *Klein v. Michelle Tuprin & Assoc., P.C.*, No. 2:14-cv-00302-RJS-PMW, 2016 WL 3661226, at *7 (D. Utah July 5, 2016); *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1149 (9th Cir. 2013).

The calculation of any amount for which Mr. White may be liable to Mr. Wardley shall be made by the Company's accountant at the time the Company ceases operations and dissolves.[122]

As to the first alleged contingency, the Trustee argues that at worst there were no "commercial shipments" of the cards, and at best, some preliminary shipments occurred in May of 2011.[123] Thus, the Trustee asserts that the Debtor was not liable on the Guaranty until May 2012 at the earliest. As to the second contingency, the Trustee correctly notes that ABC Club did not cease operations, and White never received an accounting of his liability under the Guaranty. The Trustee thus argues that the Guaranty was a contingent liability and not an antecedent debt; therefore, White received no value from the $750,000 transfer to Wardley. The Court disagrees that the Guaranty was a contingent liability, and even if it was, its satisfaction constituted reasonably equivalent value to White as the guarantor.

### b)   *Guarantee of Payment vs. Guarantee of Collection*

The Court finds that the nature of the Guaranty created immediate and direct liability in White without regard to the performance of ABC Club. The Guaranty provides: "**This is an irrevocable and unconditional promises [sic] to pay** and not a guarantee of the Company's performance" (emphasis added). This express language created an absolute guaranty of payment as opposed to a guaranty of collection.[124]

"[A] conditional guaranty, or guaranty of collection, is an obligation to pay or perform if payment or performance cannot be first reasonably obtained from the principal obligor."[125] A

---

[122] *Supra* Part II.C, ¶24.

[123] Whether a commercial shipment of cards occurred is a disputed fact. *See* Dkt. No. 73, p. 6, ¶8.

[124] *See Heritage Bank v. Southbury Lighting*, No. 103754, 1992 Conn. Super. LEXIS 1538, at *9 (Conn. Super. Ct. May 20, 1992) (contract stating that guarantor "unconditionally and absolutely guarantees . . . payment" is sufficient to impose primary liability on the guarantor).

[125] *Valley Bank & Trust Co. v. Rite Way Concrete Forming*, 742 P.2d 105, 108 (Utah 1987).

"guaranty of payment" is an unconditional obligation "and the guaranteed party need not fix its losses by pursuing its remedies against the debtor or the security before proceeding directly against the guarantor."[126] Further, "a guaranty of payment shifts much of the risk of delay or loss from the creditor to the guarantor by allowing the creditor to recover directly from the guarantor without exhausting the collateral or seeking recovery from the debtor."[127]

As a guarantor of payment, White was concurrently liable with ABC Club to repay the advances from Wardley, and Wardley was not required to first seek recovery from ABC Club. Therefore, White's liability under the Guaranty was not contingent on Wardley waiting a year to see if ABC Club would repay the loans through profits, or waiting for ABC Club to dissolve and provide White with an accounting. Further, as explained more fully below, Wardley was entitled to receive proceeds from the Lee's Summit Settlement in satisfaction of White's absolute guarantee of repayment of Wardley's loans to ABC Club.

### c)   *Conditions vs. Covenants*

The conditions in the Guaranty did not relieve White of his liability under the Guaranty. Utah law recognizes two contractual promises – covenants and conditions.[128] A covenant consists of the mutual obligations between the parties; thus, a party's failure to perform a covenant gives rise to an action for breach of contract.[129] On the other hand, a condition involves events not certain to occur and that are often dependent upon the performance of a third party.[130]

---

[126] *Id.* (citations omitted).
[127] *Machock v. Fink*, 137 P.3d 779, 784 (Utah 2006).
[128] *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 367 P.3d 994, 997 (Utah 2016).
[129] *Id.*
[130] *Id.*

In this case, the Guaranty is a covenant based on mutual promises – Wardley would make loans to ABC Club and White would guarantee their repayment. As discussed below, Wardley's loans were to be repaid by ABC Club profits, by White personally, or from the Judgment proceeds. As to Wardley's promises, the Operating Agreement acknowledges "that Lynn Wardley has lent and may, in his discretion, lend cash" to ABC Club.[131] Indeed, by the end of April 2011, Wardley had loaned at least $518,000 to ABC Club.[132] As to White's promises, he assigned a partial interest in the Judgment to Wardley and directed that any proceeds from the Judgment be disbursed to Wardley in satisfaction of the Guaranty.[133]

The conditions in the Guaranty contemplated that a third entity, ABC Club, would generate sufficient profit to fully repay Wardley's loans, and thus White would not be required to pay them under the Guaranty. However, by giving the Guaranty, White assumed the risk that ABC Club would not generate sufficient profits to repay Wardley.[134] This is consistent with the fact that the Operating Agreement employed White as an "executive" to oversee ABC Club's day-to-day operations.[135] Thus, White was in the best position to effectuate the profitability of ABC Club. Nonetheless, this condition was not certain to occur, and its existence in the Guaranty did not relieve White of his unconditional obligation to repay the loans Wardley made to ABC Club.[136]

---

[131] Dkt. No. 58, Operating Agreement, Ex. F, ¶6.7.

[132] *Supra*, Part II.C, ¶22.

[133] *Supra*, Part II.C, ¶25.

[134] *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 367 P.3d 994, 997 (Utah 2016) (The party whose liability is dependent upon the performance of a third party assumes the obligation of assuring that the third party performs.).

[135] *Supra*, Part II.C, ¶19; Dkt. No. 58, Ex. G, Executive Employment Agreement.

[136] RESTATEMENT (SECOND) OF CONTRACTS § 227 (Am. Law Inst. 1981) ("In resolving doubts as to whether an event is made a condition of an obligor's duty, . . . an interpretation is preferred that will reduce the obligee's risk of forfeiture, unless the event is within the obligee's control or the circumstances indicate that he has assumed the risk.")

#### d)    *Secondary Basis for Payment under the Guaranty*

In addition, the Court finds that the Guaranty created a secondary method for its satisfaction that was payable on demand and was not contingent on the profitability of ABC Club.[137] Specifically, in the Guaranty White assigned his interest in any proceeds from the Judgment to Wardley, with such proceeds to be paid on demand:

> Mr. White holds a judgment in litigation captioned *Theodore W. White, Jr. v. Richard McKinley*, Case No. 05-0203-CV-W-NKL, US. District Court for the Western District of Missouri, Western Division. Mr. White hereby **partially assigns his interest in such judgment to Mr. Wardley** to secure the foregoing personal guaranty, and shall cause his attorneys in that litigation, Brian F. McCallister of The McCallister Law Firm, Kansas City, Missouri, to confirm such judgment and acknowledge this partial assignment **and agree to distribute such sum upon demand from net proceeds payable to Mr. White** from amounts collected on such judgment, subject to prior claims, in satisfaction of such personal guarantee.[138]

By this language, White assigned his interest in the Judgment to Wardley to secure the Guaranty. Further, White directed his attorneys, upon demand, to distribute to Wardley such amount from the Judgment proceeds as to fully satisfy the Guaranty – and this is precisely what happened. On July 22, 2011, Lee's Summit wired $750,000 in proceeds to Wardley in full satisfaction of the Guaranty.[139]

Thus, the Court finds that White made an absolute and unconditional guaranty of repayment of Wardley's loans to ABC Club, and that the Guaranty constituted an antecedent debt on the date of the transfers to Wardley.

---

[137] *See Carrier Brokers, Inc. v. Spanish Trail*, 751 P.2d 258, 262 (Utah 1988) (If clearly stated in guaranty agreement, guarantor can waive conditions of repayment such as presentment, demand, notice, extension of time, etc.).

[138] *Supra*, Part II.C, ¶25 (emphasis added).

[139] *Supra*, Part II.E, ¶43.

### 5.     Calculation of Amount Owed Under the Guaranty

It is undisputed that between December 16, 2010 through July 8, 2011, Wardley conveyed $868,000 to ABC Club.[140] Having found that Wardley's conveyances were indeed loans and that White had absolute liability under the Guaranty to ensure the repayment of such loans, the Court finds that the amount of such liability was $868,000; thus, White's liability on the Guaranty was the maximum of $750,000 as provided for in the Operating Agreement.

### 6.     White Received Reasonably Equivalent Value When He Paid the Guaranty

Under both bankruptcy law and the UUFTA, value is given if the transfer results in the satisfaction of an antecedent debt.[141] The Court finds that White received reasonably equivalent value from the $750,000 transfer to Wardley.

#### a)     Payment on a Contingent Obligation, such as a Guaranty, is Value.

Payment on a contingent obligation, such as a guaranty, is value. COLLIER ON BANKRUPTCY summarizes the case law on the subject of guaranties and fraudulent transfers: "Payment of a pre-existing debt is value, and if the payment is dollar-for-dollar, full value is given. This is so even if the payment is on a contingent obligation, such as a guaranty.[142]

The Court has found that White's transfer of $750,000 to Wardley was in full satisfaction of his $750,000 liability on the Guaranty. As summarized in *Cox v. Grube (In re Grube)*,[143] White's

---

[140] *Supra*, Part II.C, ¶29.

[141] *See* 11 U.S.C. § 548(d)(2)(A); U.C.A. § 25-6-4(1).

[142] COLLIER ON BANKRUPTCY ¶ 548.03[4][b] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev. 2017) (citing *Silverman v. Paul's Landmark, Inc. (In re Nirvana Rest. Inc.)*, 337 B.R. 495, 502 (Bankr. S.D. N.Y. 2006) (payment on guaranty is value); *Official Comm. of Unsecured Creditors v. Conceria Sabrina S.P.A. (In re R.M.L., Inc.)*, 195 B.R. 602, 618 (Bankr. M.D. Pa. 1996) (payment of guaranty is given for "reasonably equivalent value"); *Marshack v. Wells Fargo Bank (In re Walters)*, 163 B.R. 575, 581 (Bankr. C.D. Cal. 1994) (payment on guaranty was made on account of "antecedent debt")).

[143] Bankr. No. 09-81713, Adv. No. 09-8111, 2012 WL 3263905, at *5 (Bankr. C.D. Ill. Aug. 9, 2012).

payment in satisfaction of the Guaranty is dispositive of reasonably equivalent value: "A dollar for dollar credit against personal liability is determinative as to reasonably equivalent value."[144]

In further support of the Court's finding of reasonably equivalent value is that the transfer had no impact on White's net worth – even if he was insolvent: "The focus remains on the economic benefit conferred on the debtor and the overall effect of the benefit on the debtor's net worth position."[145] The payments to Wardley had no effect, or a neutral effect, on White's net worth. His assets (his interest in the Judgment) and his liabilities (the Guaranty) both decreased by the same amount; thus, his net worth before the transfer was the same as after the transfer. Further, it makes no difference whether White was insolvent, even deeply insolvent, at the time of the transfer because it resulted in a dollar-for-dollar reduction in White's pool of debts at the time of the transfer.[146]

Finally, the Court notes that White was a direct beneficiary of Wardley's loans in that they were the only source of funding to pay White's salary that totaled $235,000. Further, Wardley's loans allowed the Debtor to pursue the ABC Club business opportunity that he anticipated would ultimately be worth "millions."[147] While the parties' financial expectations for ABC Club were unrealized, the value to the Debtor for both giving and paying the Guaranty is determined at the

---

[144] *Id.* (*citing In re R.M.L., Inc.*, 195 B.R. 602, 618 (Bankr. M.D. Pa. 1996); *In re Foos*, 188 B.R. 239, 245 (Bankr. N.D. Ill. 1995) (dollar for dollar reduction in personal guaranty liability means payments are for reasonably equivalent value "as a matter of law" and not avoidable under § 548(a)(2)), *aff'd in part, rev'd in part on other grounds*, 1996 WL 563503 (N.D. Ill. 1996); *In re Walters*, 163 B.R. 575, 581 (Bankr. C.D. Cal. 1994); *In re Coors of North Mississippi, Inc.*, 66 B.R. 845, 862 (Bankr. N.D. Miss. 1986)).

[145] *Enwotwen Indus., Inc. v. Brookstone Ltd. P'ship (In re Newtowne, Inc.)*, 157 B.R. 374, 379 (Bankr. S.D. Ohio 1993).

[146] *Charles J. Lisle v. John Wiley & Sons, Inc. (In re Wilkinson)*, 196 Fed.Appx. 337, 343 (6th Cir. 2006) (rejecting trustee's argument that satisfying a third-party antecedent debt can never amount to reasonably equivalent value for a deeply insolvent debtor).

[147] Dkt. No. 58, Dep. of Theodore William White Jr., Ex. B, p. 62:5-11.

time of the transfers, which is when the parties had high hopes for the profitability of ABC Club.[148]

Finally, there is nothing in the Complaint, the disputed facts, or the undisputed facts suggesting

that ABC Club was a sham business operated for some ulterior, illegitimate purpose.[149] The Court

thus finds that the Debtor received reasonably equivalent value in exchange for the $750,000

transfer to Wardley under the ABC Guaranty.

## VII.   CONCLUSION

In conclusion, the Court grants and denies Wardley's Motion for Summary Judgment in

part. Based upon the relevant undisputed facts, the Court finds a genuine dispute of material fact

as to whether White was personally liable under the BayHill Note, and therefore, whether he

received reasonably equivalent value for his transfer of funds to Wardley under the BayHill Note.

Thus, Wardley's Motion for Summary Judgment is denied as to the BayHill Note.

The Court finds a genuine dispute of material fact as to whether the $78,000 in personal

advances from Wardley to White were in fact loans which White was legally obligated to repay.

Thus, the Court denies Wardley's Motion for Summary Judgment as to whether White received

reasonably equivalent value in relation to the personal advances in the amount of $78,000.

The Court finds that the Trustee's Complaint does not seek the avoidance and recovery of

the $600,000 transferred by White in connection with the Consolidated Note. Thus, the Trustee

cannot now contest or pursue recovery of this transfer through his response to summary judgment.

---

[148] *Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796, 802 (5th Cir. 2002) ("[T]he value of an investment, even a risky one, such as we have before us now, is to be determined at the time of purchase.")

[149] *See Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 148, 152 (3d Cir. 1996) (The "mere 'opportunity' to receive an economic benefit in the future constitutes 'value' under the Code" so long as the opportunity was "legitimate and reasonable.").

As for White's ABC Club Guaranty, the Court assumes that the guaranty itself is not avoidable as a fraudulent transfer because that issue is not before the Court on summary judgment. The Court disagrees with the Trustee's argument that Wardley's advances to ABC Club should be recharacterized as capital contributions because: (1) the Trustee did not assert a separate cause of action for recharacterization in the Complaint; (2) the unambiguous terms of the Operating Agreement control; and (3) recharacterization of these advances as capital contributions is not appropriate under the facts.

The Court finds no genuine issue of material fact that White was personally liable under the Guaranty. White gave an absolute and unconditional guaranty of payment which created direct and immediate liability under the Guaranty. Wardley made loans to ABC Club in excess of the $750,000 Guaranty, and White was a primary beneficiary of Wardley's loans because they funded his $235,000 salary and gave him the chance to pursue a desired business opportunity. Finally, the Court finds that White received reasonably equivalent value in exchange for his payment of $750,000 to Wardley in that such transfer resulted in a dollar-for-dollar reduction of a valid, antecedent debt owed by White.

The Court will enter an Order consistent with the rulings set forth in this Memorandum Decision.

_____END OF DOCUMENT_____

_____ooo0ooo_____

**DESIGNATION OF PARTIES TO RECEIVE NOTICE**

Service of the foregoing MEMORANDUM DECISION ON LYNN E. WARDLEY'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF THE SAME (DOCKET NO. 58) shall be served to the parties and in the manner designated below.

**By Electronic Service:** I certify that the parties of record in this case as identified below, are registered CM/ECF users:

- Adam S. Affleck    asa@pyglaw.com, debbie@princeyeates.com; docket@princeyeates.com; andalin@princeyeates.com
- Troy J. Aramburu    taramburu@swlaw.com, nharward@swlaw.com, docket_slc@swlaw.com, sballif@swlaw.com
- Bret R Evans    brevans@swlaw.com, nharward@swlaw.com; docket_slc@swlaw.com
- Tessa Meyer Santiago    tms@lincolnlaw.com, lincolnlaw.tms@gmail.com

**By U.S. Mail:** In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

None.