**This order is SIGNED.**

Dated: July 11, 2019



KEVIN R. ANDERSON
U.S. Bankruptcy Judge

*ar*

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH

| In re:<br><br>THEODORE WILLIAM WHITE, JR. and PORSCHA SHIROMA,<br><br>                  Debtors.<br><br>J. KEVIN BIRD, Trustee,<br><br>                  Plaintiff,<br>vs.<br><br>LYNN E. WARDLEY, an Individual, and AMERICAN BENEFITS COMPANY, INC.,<br><br>                  Defendants. | Bankruptcy Number: 14-25727<br><br>Chapter 7<br><br><br><br><br>Adversary Proceeding No. 16-02089<br><br><br>Hon. Kevin R. Anderson |
|---|---|
| **MEMORANDUM DECISION ON LYNN E. WARDLEY'S MOTION FOR SUMMARY JUDGMENT (DOCKET NO. 58) AS TO WHEN THE DEBTOR INCURRED THE ABC CLUB GUARANTY FOR PURPOSES OF THE UTAH UNIFORM FRAUDULENT TRANSFER ACT** ||

**I.    Introduction**

Theodore William White, Jr. ("White" or the "Debtor") and Lynn E. Wardley ("Wardley") were engaged in several business transactions wherein Wardley would advance funds and the

Debtor would manage the businesses. In December 2010, Wardley and the Debtor formed an entity called ABC Club that Wardley would fund and the Debtor would manage for the purpose of selling prepaid insurance cards. In connection therewith, the Debtor orally agreed to guaranty the repayment of Wardley's advances, up to $750,000 (the "Guaranty"). In April 2011, the parties memorialized their agreements in writing in connection with the operating agreements for ABC Club.

Years later, on May 30, 2014, the Debtor and his spouse, Porscha Shiroma, filed a voluntary Chapter 7 bankruptcy petition. J. Kevin Bird was appointed as the Chapter 7 Trustee ("Trustee"). On May 30, 2016, the Trustee filed this adversary proceeding against Wardley and American Benefits Company, Inc. The Trustee amended his complaint on September 15, 2017 (the "Complaint").[1] The Complaint seeks to recover the Debtor's allegedly fraudulent transfers to Wardley under 11 U.S.C. §§ 544, 550, and the Utah Uniform Fraudulent Transfer Act ("UUFTA").[2]

On March 28, 2018, the Court issued a Memorandum Decision on Lynn E. Wardley's Motion for Summary Judgement (Docket No. 58) as to the validity of consideration the Debtor received in exchange for the transfer of $750,000 to Wardley under the Guaranty.[3] However, at that time, the Trustee did not address the avoidability of the Guaranty, so the Court had to presume that "the guaranty itself [was] not avoidable as a fraudulent transfer."[4] Consequently, the Court granted Wardley's motion for summary judgment, finding that if the Guaranty was not avoidable, then the Debtor received reasonably equivalent value for the $750,000 transfer.

---

[1] ECF No. 46.
[2] *Id*.
[3] ECF No. 78.
[4] *Id*.

Now, the Trustee is seeking to avoid the Guaranty as a fraudulent transfer either for lack of consideration or because the Guaranty was not legally enforceable until it was memorialized in writing in April 2011. If the Trustee can avoid the Guaranty as a fraudulent transfer, then it might render all or a part of the Debtor's payment of $750,000 on the Guaranty avoidable for lack of consideration.

However, at the final pre-trial conference on March 26, 2019, the parties reported they could not agree on the Disputed/Undisputed Issues of Fact and Law in the proposed pre-trial order because of a disagreement as to when the Debtor "incurred" the Guaranty for purposes of U.C.A. § 25-6-7(5) or § 25-6-7(6) (2016) ("UUFTA")[5]. To resolve this limited issue, the Court requested that the parties file supplemental briefs.[6] Following the submission of supplemental briefs by both parties, a hearing on the Effective Date Issue was held on May 8, 2019. Adam Affleck appeared on behalf of the Chapter 7 Trustee, Kevin Bird. Troy Aramburu appeared on behalf of the Defendant, Lynn Wardley.

Therefore, the contested issue before the Court is the date the Debtor "incurred" the obligation of the Guaranty for purposes of the UUFTA. Wardley argues that the Debtor incurred the Guaranty on December 6, 2010 when ABC Club was formed and Wardley began advancing funds to pay for its business operations. In counterpoint, the Trustee argues that the Debtor incurred the Guaranty on April 7, 2011, when Wardley and the Debtor signed the ABC Club operating agreement that contained the written Guaranty.

The Court has reviewed the briefing, including the supplemental brief and support documents filed by the Trustee,[7] and the supplemental brief and response from the Defendant,[8] and has conducted its own independent research of applicable law. For the reasons set forth in this

---

[5] Both of these sections use the phrase, "A transfer made or **an obligation incurred** by a debtor is fraudulent as to a creditor . . . if . . . ." (Emphasis added.)

[6] See Minute Entry, March 26, 2019.

[7] ECF Nos. 97 and 98.

[8] ECF Nos. 96 and 99.

memorandum decision, the Court grants Wardley's motion for summary judgment by finding that the applicable date that the Debtor incurred the Obligation for the ABC Club Guaranty for purposes the UUFTA is December 6, 2010.

## II. Jurisdiction and Venue

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334(a) & (b) and 157(b). Wardley's motion for summary judgment is a core proceeding under 28 U.S.C. § 157(b)(2)(H). Venue is appropriate in this District under 28 U.S.C. §§ 1408 and 1409, and notice of the hearing was properly given.

## III. Undisputed Facts

As stated above, the issue is whether the Debtor incurred the ABC Guaranty in December 2010 or April 2011. From the hearing, it was unclear to the Court as to all the reasons why the April date is of such significance to the Trustee.[9] The following factual statements from Wardley's Motion for Summary Judgment,[10] Wardley's Supplemental Brief on the Limited Issue,[11] the Trustee's Supplemental Brief and Support Document on the Limited Issue,[12] and Wardley's Reply[13] are undisputed.

1. In Missouri, the Debtor was wrongfully prosecuted for a serious crime. After being exonerated, the Debtor sued the responsible parties, and in August 2008, he recovered a judgment for $15 million. The judgment was affirmed by the Eight Circuit Court of Appeals in July 2010.

---

[9] At the hearing on May 8, 2019, the Trustee was unable, or unwilling to, stipulate to a purpose for pressing for the April 7, 2011 date, citing, at different times, reasonably equivalent value, an insolvency determination, and adequate consideration. The Trustee's theories of recovery in this adversary proceeding have been a perpetually moving target.

[10] ECF No. 58.

[11] ECF No. 96.

[12] ECF Nos. 97 and 98.

[13] ECF No. 99.

2. For several months prior to December 2010, the Debtor solicited Wardley to invest $4 million in American Benefits Company, a company wholly-owned by the Debtor or his other entities.[14]

3. While Wardley declined to invest in American Benefits Company, he eventually agreed to fund a new entity called "ABC Club, LLC" ("ABC Club") if the Debtor would guaranty the repayment of Wardley's advances, up to $750,000, in the event profits from ABC Club were insufficient to do so.[15] The parties also agreed that the Debtor would be employed by ABC Club to manage its affairs and that Wardley would own 85% and the Debtor would own 15%.[16]

4. On December 6, 2010, the parties formed ABC Club,[17] and the Debtor began to mange its startup and business operations.[18] On December 16, 2010, Wardley deposited $30,000 in the ABC Club checking account.[19]

---

[14] ECF No. 58, Ex. B, Dep. of Theodore William White Jr., Ex. B, p. 60:11-23 (hereinafter "Debtor's Depo").

    A. At the end of eight months, nine months, we [Wardley and the Debtor] came to the table and [Wardley] said, "This is what I'm willing to do."

    Q. And what was that?

    A. You [the Debtor] guarantee what I [Wardley] fund up to $750,000, and we will form a new entity, and I [Wardley] get 85 percent, and you [the Debtor] get 15 percent." And it was either take whatever value I thought the company was going to be worth, which I thought was millions of dollars, and 15 percent of something is better than 15 percent of nothing.

    . . .

    A. I got 15 percent and he [Wardley] got 85 percent . . . . And [Wardley] would be willing to front the dollars we needed to move [ABC Club] forward.

[15] *Id.*

[16] *Id.*

[17] ECF No. 98, Ex 2 at p. 40 of 61.

[18] ECF No. 58, Ex. B, Debtor's Depo, p. 204:23-205:7; Decl. of Lynn E. Wardley, Ex. C, ¶ 3; Executive Employment Agreement dated April 7, 2011, Ex. G.

[19] ECF No. 58, Ex. C, Decl. of Lynn E. Wardley, ¶ 2; *id.* Ex. 1; ECF No. 46, Am. Compl. ¶ 31; and ECF No. 48, Ans. to Am. Compl. ¶ 31

5. On April 7, 2011, the Debtor, Wardley, and C. David Hester ("Hester") executed an operating agreement for ABC Club with an effective date of December 6, 2010 (the "Operating Agreement").[20]

6. The Operating Agreement established the following ownership interests in ABC Club: Wardley 82%; the Debtor 15%; and Hester 3%.[21]

7. Between December 2010 and April 2011, Wardley advanced at least $518,000 to ABC Club.[22]

8. In the Operating Agreement, the Debtor agreed to guaranty the repayment of funds advanced by Wardley to ABC Club up to $750,000 (the "Guaranty" or "ABC Guaranty"):

> The members acknowledge that Lynn Wardley has lent and may, in his discretion, lend cash to [ABC Club]. The Members anticipate that [ABC Club] will make profits in its business in sufficient amount to repay in full the amounts loaned by Mr. Wardley to [ABC Club] with interest thereon at the agreed rate. Further, [The Debtor] acknowledges the personal benefit Mr. Wardley's organization and capitalization of [ABC Club] has provided to Mr. White in the form of his employment by and promotional ownership interest in [ABC Club]. Accordingly, Mr. White hereby personally guarantees the repayment of the full amount of Mr. Wardley's loans up to $750,000 such that to the extent the Company's cash distributions to Mr. Wardley during the first twelve (12) months of the Company's operations (commencing with the first commercial shipment of the card) do not total the amount owed on the loans he has made, Mr. White shall pay Mr. Wardley personally the shortfall. This is an irrevocable and unconditional promise to pay and not a guaranty of [ABC Club's] performance. The calculation of any amount for which Mr. White may be liable to Mr. Wardley shall be made by the Company's accountant at the time the Company ceases operations and dissolves.[23]

9.

---

[20] ECF No. 58, Ex. B, Debtor's Depo, p. 56:16-20; *id.* Ex. F.
[21] ECF No. 58, Ex. F, Operating Agreement § 6.1; Debtor's Depo, p. 62:5-7.
[22] ECF No. 78, Memorandum Decision on Wardley's Motion For Summary Judgment, ¶ 22.
[23] ECF No. 58, Ex. F, Operating Agreement § 6.7; Debtor's Depo, p. 62:5-11.

10. The Debtor's Guaranty of Wardley's advances to ABC Club was to be reduced by "cash distributions" from ABC Club to Wardley.[24]

11. In connection with the Operating Agreement, Wardley and the Debtor also signed an Executive Employment Agreement wherein ABC Club employed the Debtor "to provide executive services in charge of product development and marketing."[25]

12. The Debtor testified, "I was working for ABC Club taking a draw on something I had to pay back dollar for dollar at $20,000 a month."[26]

13. From January 2011 through September 2011, ABC Club paid the Debtor at least $235,000 in compensation, amounting to an average of approximately $26,000 a month.[27]

14. For the period beginning on December 16, 2010 through July 8, 2011, and at the Debtor's request, Wardley advanced $868,000 to ABC Club.[28]

15. The transfers made to ABC Club are evidenced by the following transactions:

    a. $30,000 check deposited on December 16, 2010;

    b. $29,000 check deposited on January 12, 2011;

    c. $19,000 check deposited on January 13, 2011;

    d. $200,000 transfer on January 13, 2011;

    e. $40,000 transfer on February 3, 2011;

    f. $50,000 transfer on February 15, 2011;

    g. $50,000 transfer on March 3, 2011;

---

[24] ECF No. 78, Memorandum Decision on Wardley's Motion For Summary Judgment, ¶ 38.
[25] ECF No.58, Ex. G, Executive Employment Agreement dated April 7, 2011.
[26] ECF No. 58, Ex. B, Debtor's Depo., p. 70:11-14.
[27] ECF No. 78, Memorandum Decision on Wardley's Motion For Summary Judgment, ¶ 28.
[28] *Id*. at ¶ 29.

      h.    $50,000 transfer on March 11, 2011;

      i.    $50,000 transfer on March 31, 2011;

      j.    $50,000 check deposited on April 13, 2011;

      k.    $50,000 check deposited on May 9, 2011;

      l.    $50,000 check deposited on May 23, 2011;

      m.    $100,000 transfer on June 13, 2011;

      n.    $50,000 transfer on July 5, 2011; and

      o.    $50,000 transfer on July 8, 2011.[29]

16.    The Debtor knew he was obligated to repay his liability under the Guaranty.[30]

17.    In July 2011, the Debtor received $15.5 million from his lawsuit, and he transferred $750,000 to Wardley in connection with the Guaranty.[31]

## IV. SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(a), as incorporated into bankruptcy proceedings by Fed. R. Bankr. P. 7056, the Court is required to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Substantive law determines which facts are material and which are not. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[32] Whether a dispute is "genuine" turns on whether "the evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party."[33] In sum, the Court's

---

[29] *Id.* at ¶ 30.

[30] *Id.* at ¶ 31.

[31] ECF No. 78, Memorandum Decision on Wardley's Motion For Summary Judgment, ¶ 43.

[32] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[33] *Id.*

function at the summary judgment stage is to "determine whether there is a genuine issue for trial."[34] This matter involves cross-motions for summary judgment by both parties as to the date the Debtor incurred the ABC Club Guaranty.

## V. ANALYSIS

### A. The Trustee Cannot Assert the Debtor's Statute of Frauds Defense.

The Trustee's amended complaint alleges that "when the Operating Agreement (containing the Guarantee) was executed, Wardley had already allegedly loaned $518,000 to ABC Club for which White had no prior obligation to pay."[35] Ostensibly this allegation relates to the Trustee's present argument under the statute of frauds that the Guaranty was not legally enforceable until it was memorialized in the Operating Agreement on April 7, 2011. Thus, the $518,000 advanced by Wardley prior to this date could constitute a fraudulent transfer.[36]

However, there are serious infirmities with the Trustee's statute of frauds argument that should have been known with a reasonable degree of legal research. The statute of frauds is an affirmative defense[37] that must be timely asserted.[38] It is also an exclusive defense of the Debtor.[39] The Trustee's complaint alleges that he has standing to avoid the Guaranty under § 544(b),[40] which means he steps "into the shoes of an actual creditor who has standing to avoid

---

[34] *Id.* at 249.

[35] ECF No. 46 at ¶ 51c.

[36] *See Klein v. Michelle Turpin & Assocs., P.C.*, No. 2:14-cv-00302-RJS-PMW, 2016 WL 3661226, at *7, 2016 U.S. Dist. LEXIS 86954 (D. Utah July 5, 2016) (because the transferor was not legally obligated to pay the debt, the transfer was avoidable as being constructively fraudulent under the UUFTA).

[37] Ut.R.Civ.Pro. 8(c).

[38] *Phillips v. JCM Dev. Corp.*, 666 P.2d 876, 884 (Utah 1983) (court declined to consider statute of frauds defense when it was not asserted in the pleadings).

[39] *Garland v. Fleischmann*, 831 P.2d 107, 109 (Utah 1992) (the statute of frauds defense is only available to the contracting parties and cannot be asserted by a third party).

[40] ECF No. 46 at ¶ 55.

the transfer under the applicable state law."[41] However, under Utah law, a creditor lacks standing to assert the Debtor's statute of frauds defense.[42] Thus, the Trustee under § 544(b) likewise lacks standing, and any cause of action based on this theory must be rejected.

Conceivably, the Trustee could seek standing under the statute of frauds by asserting the Debtor's legal claims and defenses under § 541(a)(1).[43] However, the Trustee did not plead § 541 as the basis for avoiding the Guaranty. And even if the Trustee did or could assert the Debtor's defenses under § 541, it would nonetheless be unavailing. As a surrogate of the Debtor's legal claims, the Trustee is subject to the same defenses and limitations that would apply to the Debtor.[44] As an affirmative defense, the statute of frauds is waived when the guarantor satisfies the guaranty,[45] and a "trustee in bankruptcy is bound by any waiver of a defense made by a debtor before the filing of the petition."[46] Thus, when the Debtor satisfied the Guaranty, he waived the statute of frauds defense as to the validity of the Guaranty, and this waiver is binding on the Trustee.

---

[41] *Montoya v. Tobey (In re Ewbank)*, 359 B.R. 807, 809 (Bankr. D. N.M. 2007) (citation omitted).

[42] *Garland v. Fleischmann*, 831 P.2d 107, 109 (Utah 1992) (holding that a creditor lacked standing to raise a statute of frauds defense to avoid a contract between a buyer and seller of real property because she was not a party to the contract).

[43] *Blurton v. Fesmire (In re S. Indus. Mech. Corp.)*, 266 B.R. 827, 833 (D. Tenn. 2011) (holding that a bankruptcy trustee has the same rights and defenses as the debtor, and that the trustee is likewise bound by a debtor's pre-petition waiver of such rights and defenses).

[44] *Cox v. Nostaw, Inc. (In re Cent. Ill. Energy Coop.)*, 526 B.R. 786, 792 (Bankr. C.D. Ill. 2015) and 5 Collier on Bankruptcy ¶ 541.07 (16th 2018) ("In all cases where the trustee seeks to assert or enforce the debtor's right of action against another, the trustee generally stands in the debtor's shoes regarding defenses to the action.").

[45] *Bentley v. Potter,* 694 P.2d 617, 621 (Utah 1984) ("Since a purpose of the statute of frauds is to prevent fraud and perjury on the part of one claiming that another had guaranteed a debt, the one opposing the claim cannot complain if he admits the existence of the guarantee.") (Citation omitted)). See also *Gibson v. Arnold*, 288 F.3d 1242, 1247 (10th Cir. 2002) (finding that the statute of frauds is to protect a party's rights – "not to arm contracting parties with a sword they may use to escape bargains they rue"; thus, "[i]f the defendant admits under oath that a contract was formed, the purposes of the statute of frauds are served, and the contract will be afforded full legal effect.") (Citations omitted)).

[46] *Cent. Ill. Energy Coop.*, 526 B.R. at 795 (holding that lack of consideration was an affirmative defense that was waived by the debtor pre-petition; therefore, the trustee could not use it as a basis to avoid a transfer under § 541).

For these reasons, the Court finds that the Trustee lacks standing under § 544(b)(1) to seek avoidance of the Guaranty obligation under the statute of frauds. And if the Trustee could proceed under § 541(a)(1), he would nonetheless be bound by the Debtor's waiver of the statute of frauds defense. Therefore, the Court finds that the Trustee cannot seek to avoid the Debtor's Guaranty based on the statute of frauds.

### B. Under the "Main Purpose" Exception to the Statute of Frauds, the ABC Guaranty was at All Times a Legally Enforceable Obligation of the Debtor.

In addition, the Court finds that the statute of frauds is not applicable to the facts of this case under the so-called "Main Purpose" exception. This exception provides that a promise to answer for the debt of another "is not within the Statute [of Frauds] … if the consideration for the promise is in fact or apparently desired by the promisor mainly for his own economic advantage, rather than in order to benefit the third person."[47] This logic behind this exception is that when the guarantor's "main purpose is his own pecuniary or business advantage, the gratuitous or sentimental element often present in a suretyship is eliminated . . . ."[48]

Utah law recognizes this exception. In *Nephi Processing Plant, Inc. v. Western Co-op. Hatcheries*, 242 F.2d 567, 571 (10th Cir. 1957), the Tenth Circuit considered UTAH CODE ANN. 25-5-4 regarding the need for a guaranty to be in writing, and held as follows:

> [I]t is generally held that if the predominant purpose of the promisor is to subserve or further his own interest rather than merely to underwrite the debt of another, it is an original undertaking not within the statute of frauds although it may be in form a promise to pay or discharge the debt of another and although its performance may incidentally have the effect of extinguishing the liability of another.

---

[47] Restatement (Second) of Contracts § 116; *see also Davis v. Patrick*, 141 U.S. 479, 488 (1891); *Wolff Ardis, P.C. v. Kimball Products, Inc.*, 289 F. Supp. 2d 937, 941 (W.D. Tenn. 2003).

[48] Restatement (Second) of Contracts, § 116, cmt. a.

The Utah Supreme Court has adopted the holding of *Nephi Processing* and further supported it by reference to the Utah Code:

> Regarding promises to pay another's debt, section 25-5-6 of the Utah Code specifically provides: A promise to answer for the obligation of another . . . is deemed an original obligation of the promisor and need not be in writing: . . . (2) where the creditor parts with value or enters an obligation . . . under circumstances such as to render the party making the promise the principal debtor. . . . [49]

Thus, the court held that "[w]here a promise is an original undertaking of the promisor for its own benefit, section 25-5-4(2) of the Utah Code does not apply – even when it is a promise to pay another's obligation."[50]

Here, the Debtor had a significant pecuniary interest in guaranteeing Wardley's advances because Wardley was the only source of money to fund the Debtor's long-desired business opportunity and to pay his significant salary. As recited in the Operating Agreement, the Debtor "acknowledges the personal benefit Mr. Wardley's organization and capitalization of the Company has provided to [the Debtor] in the form of his employment." And indeed, the Debtor directly received at least $235,000 in salary.[51] And while the business did not become a success, the Debtor gave the Guaranty in December 2010 because at that time he anticipated ABC Club would be worth "millions of dollars."[52]

The Court thus finds that the "Main Purpose" exception to the statute of frauds applies because the Debtor's primary motivation for giving the Guaranty was in furtherance of his own

---

[49] *Healthcare Servs. Group v. Utah Dep't of Health*, 40 P.3d 591, 596 (Utah 2002). *See also W.W. & W.B. Gardner, Inc. v. Pappas,* 470 P.2d 252 (Utah 1970) (statute of frauds requirement for promises to pay the debts of another did not apply where principal of corporation requested and benefited from plaintiff's paving services).

[50] *Id*.

[51] Mem. Decision ¶ 28.

[52] *Id. ¶* 19, 23, 27–28.

pecuniary interests and business advantage rather than a gratuitous or sentimental motivation. Therefore, the Trustee cannot seek to avoid the Debtor's Guaranty based on the statute of frauds.

### C. Under the "Partial Performance" Exception to the Statute of Frauds, the ABC Guaranty was a Legally Enforceable Obligation of the Debtor.

The Court further finds that even if the Guaranty had never been memorialized in writing, it was a nonetheless a legally enforceable obligation of the Debtor under the "Partial Performance" exception to the statute of frauds. Utah recognizes that "the doctrine of part performance allows a court of equity to enforce an oral agreement, if it has been partially performed, notwithstanding the statute [of frauds]."[53] The standard for part performance is as follows:

> [1] the oral contract and its terms must be clear and definite; [2] the acts done in performance of the contract must be equally clear and definite; and [3] the acts must be in reliance on the contract. Such acts in reliance must be such that (a) they would not have been performed had the contract not existed, and (b) the failure to perform on the part of the promisor would result in fraud on the performer who relied, since damages would be inadequate. Reliance may be made in innumerable ways, all of which could refer exclusively to the contract.[54]

The undisputed facts of this case strongly support the application of this exception to the statute of frauds. First, the terms of the parties' oral contract were simple, clear, and definite – Wardley would fund ABC Club, and the Debtor would guaranty Wardley's loans up to $750,000.[55] In consideration for this promise, Wardley would own 85% of ABC Club, and the Debtor would own 15%, oversee its day-to-day operations, and receive a generous salary.[56]

---

[53] *Martin v. Scholl*, 678 P.2d 274, 275 (Utah 1983) citing to U.C.A § 25-5-8 ("Nothing in this chapter [the statute of frauds] shall be construed to abridge the powers of courts to compel the specific performance of agreements in case of part performance thereof.").

[54] *Spears v. Warr*, 44 P.3d 742, 751 (Utah 2002) (alterations in original).

[55] Mem. Decision ¶¶ 17–19.

[56] *Id.* ¶¶ 18–19, 21, 27–28.

Second, the parties' specific and actual actions in performance of the contract were equally clear and definite. Commencing in December 2010, the parties formed ABC Club; Wardley began advancing funds; and the Debtor began the startup of ABC Club and commenced receiving his salary.

Third, the parties' actions were consistent with their oral contract, and it is clear from their deposition testimony and declarations that neither the Debtor nor Wardley would have taken these actions but for the existence of such a contract. Specifically, Wardley would not have advanced funds without the Debtor's guaranty of repayment, and the Debtor would not have incurred the guaranty and invested time in the startup of ABC Club without Wardley's funding. Further, a failure by either party to perform would have resulted in a fraud on the other. In short, each party relied upon the other's promises and acted accordingly in exchange for the perceived mutual benefit of the ABC Club business venture.

In *Rainsdon v. Garcia (In re Garcia)*, 465 B.R. 181 (Bankr. D. Idaho 2011), the Chapter 7 trustee brought a similar avoidance action based on the debtors' transfer of real property to the defendants after they had paid off the debtors' mortgage. The trustee asserted that the parties' agreement was not legally enforceable under the statute of frauds because it did not include a legal description; thus, the trustee argued, the transfer of the home was avoidable for lack of consideration. While the court agreed that the contract did not comply with Idaho's statute of frauds, it found that each party had performed their contractual obligations in that the defendants had paid the debtors' mortgage, and the debtors had conveyed the property to the defendants. Thus, Idaho's partial performance doctrine took the transaction out of the statute of frauds. Accordingly, the court held that if the trustee "contends that [the] Debtors made a constructively fraudulent

transfer to Defendants because the underlying contracts were unenforceable under the statute of frauds, the Court concludes as a matter of law that this claim cannot be sustained."[57]

Likewise, this Court finds that the partial performance exception to the statute of frauds is applicable to the facts of this case. Thus, starting in December 2010, the Guaranty constituted a valid and legally enforceable obligation of the Debtor that cannot be avoided by the Trustee under the statute of frauds.

### D. The Debtor and Wardley had a Meeting of the Minds Regarding the ABC Club Guaranty in December 2010 When They Orally Agreed to Its Material Terms and Began to Perform Consistent With Their Respective Obligations.

In the alternative to the statute of frauds argument, the Trustee asserts that the parties did not have a "meeting of the minds" as to the ABC Guaranty until they signed the Operating Agreement on April 7, 2011. For the following reasons, the Court disagrees.

A "contract of guaranty is governed by the rules of contract law . . . ."[58] Thus, a guaranty is valid if "the requisite elements of a contract exist, that is, there must be proper parties with the required capacity, mutual assent, and consideration."[59] "Under Utah law generally, formation of a contract requires an offer, an acceptance, and consideration."[60] "An offer is a manifestation of willingness to enter into a bargain.[61] "An acceptance is a manifestation of assent to an offer, such that an objective, reasonable person is justified in understanding that a fully enforceable contract has been made."[62] A binding contract thus arises "where it can be shown that the parties had a

---

[57] *Id*. at 194.

[58] *First Nat'l Bank in Grand Junction v. Osborne*, 503 P.2d 440, 442 (Utah 1972).

[59] *Id.* (quoting 38 Am. Jur.2d Guaranty, § 55).

[60] *Mitchell v. Wells Fargo Bank,* 208 F.Supp. 3d 1261 1280 (D. Utah 2017) citing to *Cea v. Hoffman*, 276 P.3d 1178, 1185 (Utah Ct. App 2013).

[61] *Engineering Assocs. v. Irving Place Assocs.*, 622 P.2d 784, 787 (Utah 1980) citing to Restatement (Second) of Contracts § 24 (1981).

[62] *Cal Wadsworth Constr. Co. v. City of St. George,* 898 P.2d 1372, 1376 (Utah 1995).

meeting of the minds as to the 'integral features of the agreement' and that the terms are sufficiently definite as to be capable of being enforced."[63]

In December 2010, the Debtor and Wardley agreed to the material terms of the guaranty. Specifically, Wardley offered to fund ABC Club if the Debtor would guaranty the repayment of such funds should ABC Club's profits be insufficient to do so.[64] In exchange, the Debtor received the following consideration: (1) the funding of ABC Club, which was a business venture the Debtor was anxious to pursue;[65] (2) a 15% ownership interest in ABC Club that the Debtor thought would be worth millions;[66] and (3) the management and operation of ABC Club that from January to September 2011 paid the Debtor a total of $235,000.[67]

The parties manifested their mutual assent to these terms starting in December 2010 Further, each party fulfilled their responsibilities under the oral agreement. The parties formed ABC Club on December 6, 2010; Wardley began depositing funds into the ABC Club bank account; and the Debtor began to run ABC Club's day-today affairs.[68] Specifically, between December 16, 2010 and April 7, 2011 (the date of the Operating Agreement), Wardley had advanced $518,000 to ABC Club. And between April 7, 2011 through July 8, 2011, Wardley advanced another $350,000 for a total of at least $868,000 to ABC Club.[69] Second, between January 2011 and July 2011, the Debtor received at least $235,000 in compensation.[70] It is clear

---

[63] *LD III, LLC v. BBRD, LC*, 2009, 221 P.3d 867, 872 (Utah ); *accord Frandsen v. Gerstner*, 487 P.2d 697, 700 (Utah 1971) ("Under basic contract theory, generally a contract arises from the time . . . the offeree communicated the acceptance . . . to the offeror.").

[64] ECF No. 58, Ex. B, Debtor's Depo. p. 62:1-19.

[65] *Id*.

[66] *Id*.

[67] ECF No. 71, Trustee's Memorandum in Opposition to Motion for Summary Judgment, at ¶ 39.

[68] *Id*. at ¶ 29.

[69] *Id*. at ¶¶ 41-42.

[70] *Id.* at ¶ 39.

from the books and records of ABC Club that but for Wardley's significant contributions of cash, ABC Club would not have had the funds to operate or to pay the Debtor's salary. Third, consistent with their oral agreement and the Operating Agreement, when the Debtor collected on his judgment, he immediately paid Wardley $750,000 on the Guaranty.

Therefore, based on well-settled principles of contract law, the Court finds that the parties reached an agreement regarding Wardley's funding of ABC Club and the Debtor's Guaranty. Further, the Debtor has never contested his liability under the Guaranty and has admitted in words and in action that it was a valid and enforceable Guaranty. Thus, the Debtor incurred the Guaranty obligation in December of 2010.

### E. The Date in the Operating Agreement Controls as to When the Debtor Incurred the ABC Club Guaranty Obligation.

Lastly, the Trustee argues that without regard to the stated effective date in the Operating Agreement of December 6, 2010, the earliest the Guaranty could be deemed "incurred" for purposes of the UUFTA was April 7, 2011. The Court disagrees because it was clearly the parties' intent that the Guaranty be effective on December 6, 2010, which is consistent with both their actions and the effective date stated in the Operating Agreement.

In *Daewoo Elecs. Am., Inc. v. T.C.L. Indus. (H.K.) Holdings Ltd.* 2010 U.S. Dist. LEXIS 85612; 2010 WL 3311839 (D. N.J. 2010), the parties prepared a guaranty agreement with a stated effective date of December 4; however, the parties continued to negotiate other issues and did not sign the contract until two months later. The effective date of the guaranty was a dispositive issue in the case. The court held that it "must seek the meaning and intention of the parties when interpreting the terms of a contract" and that "it is the 'the intent expressed or apparent in the

writing that controls.'"[71] Accordingly, the court held that the December effective date stated in the guaranty agreement controlled without regard to the fact that it was signed in February.[72]

The Court agrees with this analysis and finds, pursuant to the intent of the parties and the terms of the Operating Agreement, that its effective date was December 6, 2010, even though it was not signed until April 7, 2011. Thus, for purposes of the UUFTA, the Debtor incurred the ABC Guaranty on December 6, 2010.

## VI. CONCLUSION

Based on the undisputed facts and applicable law, the Court finds that the Debtor incurred the obligation of the ABC Guaranty on December 6, 2010. Further The Trustee lacks standing and is otherwise legally precluded from asserting a statute of frauds defense to the Debtor's Guaranty of funds advanced by Wardley to ABC Club; thus, the Trustee cannot avoid the Guaranty under the statute of frauds.

_____END OF DOCUMENT_____

---

[71] *Id*. at 9 (citations omitted).
[72] *Id*. at 10.

_____ooo0ooo_____

## DESIGNATION OF PARTIES TO RECEIVE NOTICE

Service of the foregoing Memorandum Decision shall be served to the parties and in the following manner.

**By Electronic Service:** I certify that the parties of record in this case as identified below, are registered CM/ECF users:

- Adam S. Affleck - asa@pyglaw.com, debbie@princeyeates.com; docket@princeyeates.com; andalin@princeyeates.com
- Troy J. Aramburu - taramburu@swlaw.com, nharward@swlaw.com, docket_slc@swlaw.com, sballif@swlaw.com
- Bret R Evans - brevans@swlaw.com, nharward@swlaw.com; docket_slc@swlaw.com
- Tessa Meyer Santiago - tms@lincolnlaw.com, lincolnlaw.tms@gmail.com

**By U.S. Mail:** In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

None.