**This order is SIGNED.**


**Dated: September 28, 2021**



KEVIN R. ANDERSON
U.S. Bankruptcy Judge

*slo*

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>THEODORE WILLIAM WHITE, JR.<br>and PORSCHA SHIROMA,<br>　　　　　　　Debtors. | Bankruptcy Number: 14-25727<br>Chapter 7 |
| J. KEVIN BIRD, Chapter 7 Trustee,<br><br>　　　　　Plaintiff,<br>vs.<br>LYNN E. WARDLEY, an Individual,<br>and AMERICAN BENEFITS<br>COMPANY, INC.,<br>　　　　　　Defendants. | Adversary Proceeding No. 16-02089<br><br>Hon. Kevin R. Anderson |

**MEMORANDUM DECISION RE: TRUSTEE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (REASONABLY EQUIVALENT VALUE)
(DOCKET NO. 112)**

---

This is the Trustee's third Motion for Partial Summary Judgment[1] that seeks to avoid as a constructively fraudulent transfer the Debtor's guaranty of up to $750,000 in future loans by the Defendant.[2] If the Trustee can avoid the guaranty, he may be able to avoid the $750,000 transfer made in satisfaction of the guaranty. The Defendant's loans enabled the Debtor to pursue a business venture he thought would be worth millions of dollars and provided the funding to pay the Debtor's salary of $235,000 over nine months. Further, in connection with giving the guaranty,

---

[1] ECF No. 112. Previous motions for summary judgment are found at ECF Nos. 58, 61, and 97.
[2] ECF No. 46, ¶ 49-55.

the Debtor obtained a 15% ownership interest in the company along with performance incentives to increase his ownership interest in the business from 15% to 25% and to earn a bonus of up to $500,000. While the business was not a success, the value of the property interests received in exchange for the guaranty is to be determined at the time of the transfer and without the benefit of hindsight. For the following reasons, the Court finds that at the time of the transaction, the Debtor received reasonably equivalent value in exchange for agreeing to guaranty up to $750,000 of the Defendant's future loans.

## I.   UNDISPUTED FACTS

### A.   Findings of Fact.[3]

#### a.   The $15 Million Judgment in Favor of the Debtor.

1.   In August 2008, the Debtor obtained a judgment of $15 million against the City of Lee's Summit, Missouri, for a wrongful conviction (the "Judgment").

2.   In May 2010, the Eighth Circuit Court of Appeals affirmed the Judgment.[4]

3.   On July 22, 2011, Lee's Summit agreed to pay the Debtor $15.5 million in satisfaction of the Judgment.

#### b.   The Formation of ABC Club, the Debtor's Guaranty of $750,000, and the Debtor's Repayment of the Guaranty.

4.   The Debtor was involved in one capacity or another with American One Benefits Company, LLC; FrogBoss, LLC; and American Senior Benefits Company (collectively "American Benefits").[5]

---

3 The Court has issued three previous memorandum decisions on the parties' motions for summary judgment, each of which established undisputed facts. The relevant facts from those decisions are set forth herein. *See Memorandum Decisions*, ECF Nos. 75, 78, and 102.

4 *White v. McKinley*, 605 F.3d 525 (8th Cir. 2010).

5 ECF No. 112, Trustee's Statement of Undisputed Facts at ¶ 1.

5.      The Debtor intended to use American Benefits to establish a business of selling supplemental insurance cards for dental, vision, prescriptions, etc.[6]

6.      The Debtor had prior experience in setting up and running a supplemental insurance card company.[7]

7.      American Benefits had developed marketing strategies and owned domain names and software.[8]

8.      However, in the fall of 2010, the Debtor reached the point that he needed a significant investor in American Benefits, or he would have to shut down the business.[9]

9.      The Debtor solicited the Defendant to invest $4 million in American Benefits.[10]

10.      While the Defendant declined to invest in American Benefits, the Defendant and the Debtor eventually agreed to the following:

   a.      The Defendant would loan money to the Debtor to pursue the insurance card venture[11] on the condition the Debtor would guaranty the Defendant's funding up to $750,000 and secure it with an interest in the Judgment (the "Guaranty").[12]

---

[6] ECF No. 113, Ex. 14, Dep. of Theodore William White Jr., at p. 40-42 and 48.

[7] ECF No. 113, Ex. 14, Dep. of Theodore William White Jr., at p. 138 ("Well, I had done it previously. It wasn't the first rodeo. I built the first ancillary health card in the country, took it public. We raised $14 million, and Aflac and Bankers Life and Prudential agents sold the cards.").

[8] ECF No. 112, Trustee's Statement of Undisputed Facts at ¶ 2.

[9] *Id*. at p. 210.

[10] ECF No. 112, Trustee's Statement of Undisputed Facts at ¶ 5.

[11] ECF No. 113, Ex. 16, 2004 Exam of Lynn Wardley, at p. 56 ("My deal with Ted was specifically to give – to make loans to Ted so that he could expand or start the business . . . ."); and Ex. 15, Dep. of Lynn E. Wardley, at p. 83-84 ("My understanding was that I advanced Ted funds. He used them for whatever he used them for and I was guaranteed to be paid back when there was a settlement [of the Judgment].").

[12] ECF No. 113, Ex. 15, Dep. of Lynn E. Wardley, at p. 67 ("I'm just saying that Ted White, any monies that I forwarded to ABC, *et cetera*, Ted White guaranteed or I wouldn't have forwarded them . . . ."); and at p. 81-82 ("And my opinion is I never lent it to ABC Club, I lent it to Ted . . . . The fact that he guaranteed the payment of it . . . through his settlement. And that's why I was making the loan to him.").

     b.     The Debtor would form a new entity called ABC Club LLC ("ABC Club") to pursue the insurance card business venture.[13]

     c.     The Defendant would receive an 85% interest in ABC Club, and the Debtor would receive a 15% interest.[14]

     d.     The Debtor would be employed by ABC Club "to provide executive services in charge of product development and marketing."[15]

11.     The Debtor agreed to this arrangement because "it was either take whatever value I thought the company was going to be worth, which I thought was millions of dollars, and 15 percent of something is better than 15 percent of nothing."[16]

12.     The Debtor also testified: "The promises were made to me that I would run the company, sell millions of cards, and get my 15 percent, and be paid a salary."[17]

13.     The Defendant viewed his advances to ABC Club as loans to the Debtor because it was the Debtor who had guaranteed the loans, it was the Debtor who assigned an interest in the Judgment to Defendant, and it was the Debtor who ran ABC Club.[18]

14.     Likewise, the Debtor viewed the transaction as Defendant advancing funds to him that the Debtor then advanced to ABC Club.[19]

---

[13] ECF No. 113, Ex. 14, Dep. of Theodore William White Jr., at p. 62-63 ("It all became American Benefits Club.").

[14] ECF No. 113, Ex. 14, Dep. of Theodore William White Jr., at p. 61-62 ("At the end of eight months, nine months, we . . . came to the table and [Defendant] said, 'This is what I'm willing to do' . . . . 'You guarantee what I fund up to $750,000, and we will form a new entity, and I get 85 percent and you get 15 percent.'"). The final ownership interests of the parties ended up being slightly different with the Defendant allocating 3% of his interest to a third party as detailed in subsequent paragraphs.

[15] ECF No. 113, Ex. 3, Executive Employment Agreement at 1.

[16] ECF No. 113, Ex. 14, Dep. of Theodore William White Jr., at p. 61.

[17] *Id.* at p. 210.

[18] ECF No. 113, Ex. 15, Dep. of Lynn E. Wardley, at p. 81-84, 93, 94, and 96.

[19] ECF No. 113, Ex. 14, Dep. of Theodore William White, Jr. at p. 152-53 ("In essence, I advanced every dollar that had been advanced by [Defendant] to the [ABC Club] to further the company, took a 15 percent minority stake, and paid back 100 percent of what he had advanced . . . ."). *See also Id.* at 70 and 222-23.

15.      On December 6, 2010, ABC Club was registered with the State of Nevada as an LLC,[20] and the first ledger entry for ABC Club was made on December 16, 2010.[21]

16.      There is no evidence that ABC Club assumed or carried any of the debts of the American Benefits entities.

17.      In December 2010, and based on their agreements, Defendant began advancing funds for use by ABC Club,[22] and the Debtor began to oversee its day-to-day affairs.[23]

18.      Between December 2010 and April 2011, the Defendant loaned at least $868,000 to the Debtor for ABC Club.[24]

19.      On April 7, 2011, the Debtor, the Defendant, and C. David Hester ("Hester") executed an operating agreement for ABC Club with an effective date of December 6, 2010[25] (the "Operating Agreement").[26]

20.      The Operating Agreement established the following ownership interests in ABC Club: 82% to Defendant; 15% to the Debtor; and 3% to Hester.[27]

21.      The Operating Agreement granted the Debtor the right to the first $1.00 for every insurance card sold, up to 250,000 cards. It also provided an option for Defendant to grant the Debtor an additional $1.00 per card up to the second 250,000 cards sold, for a maximum incentive of $500,000 if ABC Club was successful.[28]

---

[20] ECF No. 113, Ex. 10 at 1.

[21] ECF No. 113, Ex. 11 at 1.

[22] ECF No. 113, Ex. 17, Decl. of Lynn E. Wardley, ¶ 2; Ex. 14, Dep. of Theodore William White Jr. at p. 205.

[23] ECF No. 113, Ex. 14, Dep. of Theodore William White Jr., at p. 204-05; and Ex. 17, Decl. of Lynn E. Wardley, at ¶ 3.

[24] ECF No. 113, Ex. 17, Decl. of Lynn E. Wardley, at ¶ 2.

[25] See ruling in ECF No. 102, "Memorandum Decision on Lynn E. Wardley's Motion for Summary Judgment (Docket No. 58) as to When the Debtor Incurred the ABC Club Guaranty for Purposes of the Utah Uniform Fraudulent Transfer Act."

[26] ECF No. 113, Ex. 2, Operating Agreement.

[27] *Id*. at § 6.1 and Ex. 14, Dep. of Theodore William White Jr., at p. 62.

[28] ECF No. 113, Ex. 2, Operating Agreement at § 6.5(a)(i).

22.     Further, on April 7, 2011, Defendant offered as a performance incentive to transfer to the Debtor 5% of Defendant's interest in ABC Club upon the sale of one million cards within a year of the first shipment of cards and another 5% upon the sale of 1.8 million cards within 18 months after the first shipment.[29] This incentive would allow the Debtor to increase his ownership interest in ABC Club from 15% to 25%.

23.     In the Operating Agreement, the Debtor memorialized his prior agreement to guaranty the repayment of up to $750,000 of Defendant's loans:

> The Members acknowledge that Lynn Wardley has lent and may, in his discretion, lend cash to the Company. The Members anticipate that the Company will make profits in its business in sufficient amount to repay in full the amounts loaned by Mr. Wardley to the Company with interest thereon at the agreed rate. Further, Ted White acknowledges the personal benefit Mr. Wardley's organization and capitalization of the Company has provided to Mr. White in the form of his employment by and promotional ownership interest in the Company. Accordingly, Mr. White hereby personally guarantees the repayment of the full amount of Mr. Wardley's loans, up to $750,000.00, such that to the extent the Company's cash distributions to Mr. Wardley during the first twelve (12) months of the Company's operations (commencing with the first commercial shipment of the card) do not total the amount owed on the loans he has made, Mr. White shall pay Mr. Wardley personally the shortfall. This is an irrevocable and unconditional promises [sic] to pay and not a guarantee of the Company's performance. The calculation of any amount for which Mr. White may be liable to Mr. Wardley shall be made by the Company's accountant at the time the Company ceases operations and dissolves.[30]

24.     As part of the Guaranty, the Debtor also assigned his interest in the $15 million Judgment to the Defendant:

> Mr. White holds a judgment in litigation captioned Theodore W. White, Jr. v. Richard McKinley, Case No. 05-203-CV-W-NKL, U.S. District Court for the Western District of Missouri, Western Division. Mr. White hereby partially assigns his interest in such judgment to Mr. Wardley to secure the foregoing personal guaranty, and shall cause his attorneys in that litigation, Brian F. McCallister of the

---

[29] ECF No. 113, Ex. 4, Incentive Agreement Letter.
[30] ECF No. 113, Ex. 2, Operating Agreement, § 6.7.

McCallister Law Firm, Kansas City, Missouri, to confirm such judgment and acknowledge this partial assignment and agree to distribute such sum upon demand from net proceeds payable to Mr. White from amounts collected on such judgment, subject to prior claims, in satisfaction of such personal guarantee.[31]

25.    In July 2011, the City of Lee's Summit agreed to pay the Debtor $15.5 million in satisfaction of the Judgment.[32]

26.    On or about July 22, 2011, $750,000 of the Judgment proceeds were wired to the Defendant in satisfaction of the Guaranty (the "$750,000 Transfer").[33] The Court has previously found that the $750,000 Transfer is not avoidable.[34]

27.    At the time of the $750,000 Transfer, the Defendant had loaned $868,000 to the Debtor for the ABC Club business venture.[35]

     c.    The Debtor's Employment with ABC Club.

28.    In connection with the Operating Agreement, Wardley and the Debtor also signed an Executive Employment Agreement that memorialized the terms of Debtor's employment "to provide executive services in charge of product development and marketing."[36]

29.    The Debtor's employment was not guaranteed, and the Defendant could terminate his employment at will without cause on 30 days' notice.[37]

30.    The Debtor testified, "I was working for ABC Club taking a draw on something I had to pay back dollar for dollar at [$]20,000 a month."[38]

---

[31] *Id.*

[32] ECF No. 113, Ex. 1, Proposed Pretrial Order, ¶ 8.

[33] *See* ECF No. 113, Ex. 1, Proposed Pretrial Order ¶ 9.

[34] ECF No. 78, "Memorandum Decision on Lynn E. Wardley's Motion for Summary Judgment."

[35] *Infra,* ¶ 33.

[36] ECF No.113, Ex. 3, Executive Employment Agreement.

[37] *Id.* at § 2.

[38] ECF No. 113, Ex. 14, Dep. of Theodore William White Jr., at p. 70.

31.     From January 2011 through September 2011, the Debtor received at least $235,000 in compensation, amounting to an average of $26,000 a month over nine months.[39]

32.     On, or around, September 2011, Defendant informed the Debtor that he was no longer going to loan money to pay the Debtor's salary, so the Debtor ceased working with ABC Club because he could not afford to work for no compensation.[40]

      d.    The Defendant's Loans.

33.     Beginning on December 16, 2010, and continuing through the date of the $750,000 Transfer in July 2011, Defendant provided $868,000 in loans for use by the Debtor to operate ABC Club pursuant to the following schedule:[41]

| | | |
|---|---|---|
| $30,000 | check | Dec. 16, 2010 |
| $29,000 | check | Jan. 12, 2011 |
| $19,000 | check | Jan. 13, 2011 |
| $200,000 | transfer | Jan. 13, 2011 |
| $40,000 | transfer | Feb. 3, 2011 |
| $50,000 | transfer | Feb. 15, 2011 |
| $50,000 | transfer | March 3, 2011 |
| $50,000 | transfer | March 11, 2011 |
| $50,000 | transfer | March 31, 2011 |
| $50,000 | check | April 13, 2011 |
| $50,000 | check | May 9, 2011 |
| $50,000 | check | May 23, 2011 |
| $100,000 | transfer | June 13, 2011 |
| $50,000 | transfer | July 5, 2011 |
| $50,000 | transfer | July 8, 2011 |
| **$868,000** | | |

---

[39] ECF No. 112, Trustee's Statement of Undisputed Facts at ¶ 29; *see* ECF No. 78, Memorandum Decision on Lynn E. Wardley's Motion for Summary Judgment, at ¶ 28.

[40] ECF No. 112, Trustee's Statement of Undisputed Facts at ¶ 33; ECF No. 113, Ex. 14, Depo. of Theodore William White Jr., at p. 205-07.

[41] ECF No. 58, Ex. 2, ABC Club Ledger covering 12/16/2010 through 8/27/2013; ECF No. 78, Memorandum Decision on Lynn E. Wardley's Motion for Summary Judgment, at ¶ 30. The Court references the ABC Club, LLC General Ledger attached as Exhibit 2 to Wardley's Motion for Summary Judgment (ECF No. 58) because the Court previously made calculations from this ledger in connection with the Memorandum Decision at ECF No. 78.

34.     From the time of the $750,000 Transfer in July 2011, through the last compensation payment to the Debtor on September 30, 2011, Defendant loaned an additional $190,000.[42]

35.     From December 2011 through September 2011, the revenue from the sale of ABC Club insurance cards was less than $50.[43]

36.     Thus, the sole source of funds to pay the Debtor's $235,000 compensation came from Defendant's loans.

37.     After the last compensation payment to the Debtor in September 2011, ABC Club continued to operate through approximately November 2012, with the Defendant advancing an additional $158,500.[44]

38.     In summary, from December 16, 2011, through November 19, 2012, Defendant loaned a total of $1,216,550 for the ABC Club business venture.

39.     Other than reimbursement for travel expenses, the ABC Club ledger does not show any payments to Defendant.[45]

40.     The general ledger of ABC Club balances in that it accounts for the disposition of all of Defendant's loans, all business expenses, and all revenue.[46]

## II.     THE PARTIES' POSITIONS

The second cause of action in the Trustee's complaint alleges that the Debtor did not receive reasonably equivalent value in exchange for agreeing to the $750,000 Guaranty. Therefore, the Trustee asserts that he can avoid the Guaranty and thereby avoid and recover the $750,000 Transfer.

---

[42] *Id*.

[43] *Id*.

[44] *Id.*

[45] *Id.*

[46] *Id*.

### A.    The Trustee's Arguments.

The Trustee raises two categories of arguments. First, the Trustee contends that the Debtor's employment as the ABC Club executive was not reasonably equivalent value for the Guaranty. Specifically, the Trustee asserts: (1) the promised employment was illusory because the Debtor was an at-will employee who could be terminated at any time; (2) the promised employment was not an asset against which creditors could execute; and (3) the Debtor's compensation was not received for the Guaranty but for services rendered to ABC Club.

The Trustee's secondary argument is that the Debtor's 15% equity stake in ABC Club never had value because the business started out in debt, never had capital or equity, and the 15% interest was not given in exchange for the Guaranty.

### B.    Defendant's Arguments.

In counterpoint, Defendant argues that the Debtor received reasonably equivalent value for the Guaranty based on the following. The Debtor was anxious to pursue the ABC Club business venture that he thought would be worth millions, but he was out of funding options. After much persuasion, Defendant agreed to loan funds to the Debtor to start up and operate ABC Club on the condition that the Debtor would guaranty up to $750,000 of the loans. As part of the deal, ABC Club would compensate the Debtor for his services, and from January through September 2011, the Debtor received $235,000 that was paid solely from the Defendant's loans. The Debtor also received a 15% interest in ABC Club that he thought would be worth much more than the $750,0000 Guaranty. The Debtor also had a contractual right to performance incentives for a $500,000 bonus and an additional 10% interest in ABC Club if the business was successful.

III.    ANALYSIS

A.     Summary Judgment Standard

Under Fed. R. Civ. P. 56(a), as incorporated by Fed. R. Bankr. P. 7056, the Court is required to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Substantive law determines which facts are material and which are not. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[56] Whether a dispute is "genuine" turns on whether "the evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party."[57] In sum, the Court's function at the summary judgment stage is to "determine whether there is a genuine issue for trial."[58]

The moving party bears the burden to show that it is entitled to summary judgment,[59] including the burden to properly support its summary judgment motion as required by Rule 56(c).[60] If the moving party has failed to meet its burden, "summary judgment must be denied," and the nonmoving party need not respond because "no defense to an insufficient showing is required."[61] Once the moving party meets its initial burden, "the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."[62] The nonmoving party may not rely

---

[56] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[57] *Id.*

[58] *Id.* at 249.

[59] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[60] *Murray v. City of Tahlequah, Okla.*, 312 F.3d 1196, 1200 (10th Cir. 2002).

[61] *Reed v. Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002) (citation omitted)

[62] *Concrete Works of Colorado, Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994).

solely on allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial."[63]

When considering a motion for summary judgment, the Court views the record in the light most favorable to the non-moving party,[64] but the Court does not weigh the evidence or make credibility determinations.[65]

**B.      The Standard for Avoiding a Transfer for a Lack of Reasonably Equivalent Value.**

The Trustee's second cause of action in the amended complaint filed in September 2017 seeks to avoid the Guaranty under 11 U.S.C. § 544(b), which incorporates Utah's Fraudulent Transfer Act of Utah Code Ann. § 25-6-*1 et. seq.* (2016).[47] Specifically, the complaint alleges a lack of reasonably equivalent value under Utah Code Ann. §§ 25-6-5(1)(b) and 25-6-6(1).

Utah Code Ann. § 25-6-5 is titled "Fraudulent Transfer–Claim Arising Before or After Transfer" and provides in relevant part:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> . . .
> (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation; and the debtor:
>
>> (i)   was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

---

[63] *Celotex*, 477 U.S. at 324.

[64] *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1279 (10th Cir. 2013) (citation omitted).

[65] *Nat'l Am. Ins. Co. v. Am. Re-Insurance Co.*, 358 F.3d 736, 742-43 (10th Cir. 2004) (*citing Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 533 (10th Cir. 1994)).

[47] ECF No. 46 (amended complaint). The transfer relating to the Guaranty occurred on December 6, 2010, so the applicable statute is the Utah Uniform Fraudulent Transfer Act (Utah Code Ann. § 25-6-1 *et seq.*) (the "UFTA"). The Utah legislature amended the UFTA on March 21, 2017, and renamed it the "Uniform Voidable Transactions Act" to cover transfers made after May 8, 2017. See Utah Code Ann. § 25-6-406(2)(b).

(ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Utah Code Ann. § 25-6-6 is titled "Fraudulent Transfer–Claim Arising Before Transfer" and provides in relevant part:

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if:

(a) the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation; and

(b) the debtor was insolvent at the time or became insolvent as a result of the transfer or obligation.

Thus, to avoid the Guaranty as a constructively fraudulent transfer, the Trustee must show by a preponderance of the evidence that the Debtor did not receive reasonably equivalent value.[48] "Value is given for a transfer . . . if, in exchange for the transfer . . . property is transferred."[49] Reasonably equivalent means "approximately equivalent" or "roughly equivalent."[50] "There is no minimum percentage or amount necessary to constitute reasonably equivalent value and the exchange of value need not be dollar-for-dollar. The determination of reasonably equivalent value is a fact-intensive inquiry."[51] The "value that the transferor received, must be determined at the time of the transfer without the benefit of hindsight."[52] Thus, the Court will focus on what property and rights were transferred to the Debtor and the value of such property and rights at the time of the Guaranty in December 2010.

---

[48] Defendant's brief argues for a clear and convincing standard of proof, but that higher standard only applies to a transfer made with an actual intent to hinder, delay, or defraud creditors under Utah Code Ann. § 25-6-5(1)(a) (2016). *See Jones v. Mackey Price Thompson & Ostler*, 469 P.3d 879, 890–91 (Utah 2019) (holding that the applicable standard for a constructively fraudulent transfer is a preponderance of the evidence).

[49] Utah Code Ann. § 25-6-4(1) (2010).

[50] *BFP v. Resolution Tr. Corp.*, 511 U.S. 531, n.4 (1994).

[51] *West v. Christensen (In re Christensen)*, Nos. 11-30743, 13-2248, 2014 Bankr. LEXIS 2066, at *13 (Bankr. D. Utah May 8, 2014).

[52] *Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, Nat'l Ass'n (In re M. Fabrikant & Sons, Inc.)*, Nos. 06-12737, 07-02780, 08-01734, 2009 Bankr. LEXIS 3606 *37, 2009 WL 3806683 (Bankr. S.D.N.Y. Nov. 10, 2009) (internal citations omitted).

### C.   The Debtor Directly Benefited from the Guaranty.

The Trustee argues that the Debtor only received an indirect benefit from the Guaranty as he was guaranteeing loans made to ABC Club. The Court disagrees. While the loan proceeds went into the ABC Club account and were used for ABC Club operations, both parties viewed the loans as being made to the Debtor for use at his discretion for the operation of ABC Club. Indeed, the Defendant was not involved in the operation of ABC Club, and it was the Debtor who made all decisions regarding the business, including when to request loans from Defendant and how to spend the loan proceeds. Additionally, only the Debtor had a written obligation to repay Defendant's loans as there was no note between Defendant and ABC Club. In short, the loans were effectively to the Debtor, he was their primary beneficiary (as detailed more specifically below), and that is why he agreed to guaranty their repayment up to $750,000. It is form over substance to say that the Debtor guaranteed the third-party debt of ABC Club, and thus any benefits from the Guaranty only indirectly flowed to him. Therefore, the Court finds that the Guaranty resulted in a direct benefit to the Debtor.

### D.   The Debtor Received Reasonably Equivalent Value in Connection with the Guaranty.

> a. <u>By Giving the Guaranty, Defendant Funded the Debtor's ABC Club that the Parties Thought Would Be Worth Millions, that Paid the Debtor $235,000, and that Provided the Debtor with Incentives with a $500,000 Potential and an Increased Ownership Interest in ABC Club.</u>

The UFTA requires the Court to consider the value of property interests received by the Debtor at the time of the transfer. In this case, the parties' business agreements involved the following: (1) Defendant would provide funding to the Debtor for use by ABC Club, and the Debtor would guaranty and secure such loans up to $750,000; (2) the Debtor would be employed as the executive for ABC Club with compensation of $20,000 a month; (3) the Debtor would receive a 15% interest in ABC Club; and (4) the Debtor could earn a performance bonus up to an

additional $500,000 plus an additional 10% in ABC Club if the business sold a set number of

insurance cards by a set date. The parties memorialized these terms in the Operating Agreement

and the Executive Employment Agreement. However, the Debtor's employment was contingent

on meeting "minimum performance levels as determined in the satisfaction of the Company,"[53]

and that the Debtor could be terminated "without cause" with 30-day's notice.[54]

From January 2011 through September 2011, ABC Club paid the Debtor at least $235,000

in compensation. During this same period, the Defendant loaned $1,058,000 for use by ABC Club.

The sole source of funding to pay the Debtor's compensation came from the Defendant's loans, as

ABC Club had not generated any meaningful revenues during this period.

The Trustee asserts that the Debtor's employment and compensation are not reasonably

equivalent value for the Guaranty because the promised employment was illusory, it was not an

asset that benefited creditors, and the resulting compensation was not related to the Guaranty.

### b.     The Defendant's Promises Were Not Illusory.

The Trustee asserts that the promised employment was illusory because the Defendant

could terminate the Debtor at will. First, a right to terminate does not of itself render a promise of

employment illusory. As noted by the Utah Supreme Court:

> [T]he reservation by a promisor of a power to cancel upon the occurrence of some
> event not wholly controlled by the promisor himself does not render his promise
> illusory or the contract invalid. Even if the promisor is himself to be the judge of
> the cause or condition, he must use good faith and an honest judgment.[55]

---

[53] ECF No. 113, Ex. 3, Executive Employment Agreement, at ¶¶ 1-2.

[54] *Id.* at 2.

[55] *Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1038 (Utah 1985) (internal quotations omitted), citing to *Smith, Batchelder & Rugg v. Foster*, 406 A.2d 1310 (1979) (holding that provision permitting employer to terminate contract if dissatisfied with employee's work did not render employer's promise illusory because of implicit good faith requirement that employer be dissatisfied with employee's work.). *See also Peirce v. Peirce*, 994 P.2d 193, 199 (Utah 2000) (finding that the "tendency of the law is to avoid the finding that no contract arose due to an illusory promise when it appears that the parties intended a contract.").

Second, Defendant honored the promise by funding the Debtor's compensation from January through September 2011. While the Defendant thereafter declined to fund further compensation to the Debtor, the Debtor nonetheless received actual compensation for nine months totaling $235,000, and this establishes that Defendant's promise of employment and compensation was not illusory.[56]

Likewise, the Trustee asserts that Defendant's agreement to loan funds was illusory in that if Defendant "did not want to make loans to ABC Club, he didn't have to." This is true, and if at the time of the agreements the Defendant had no intention or ability to make loans, then this argument might have merit. But in counterpoint to the Trustee's assertion, the Court observes that if the Defendant had not made the promised loans, then the Debtor would not have owed anything under the Guaranty. But the reality is that the Defendant did loan funds in an amount in excess of the $750,000 Guaranty, and this establishes that Defendant's promise to loan funds was not illusory.[57]

c.    <u>The Debtor's Salary was an Asset Available to Creditors.</u>

Trustee next argues that the Debtor's employment provided no value because it was not an asset that benefitted the Debtor's creditors. While a job alone may not be an asset, the cash received thereunder certainly is because it can be used to pay debts, to avoid incurring additional debt, to acquire property, or to be garnished by creditors. Thus, the Debtor's compensation of $235,000 in cash was an asset that increased the Debtor's net worth.

---

[56] *See Francisconi v. Hall*, 2008 UT App 166, n.11 (Utah Ct. App. 2008) (finding that a contract was not illusory because defendant had received actual consideration in the form of using plaintiff's credit worthiness to purchase real property defendant wanted but could not qualify for).

[57] *Id*. *See also Peirce v. Peirce*, 994 P.2d 193, 199 (Utah 2000) (holding that an illusory promise is "only the facade of a promise, i.e., a statement made in such vague or conditional terms that the person making it commits himself to nothing" and thus an illusory promise "neither binds the person making it . . . nor functions as consideration for a return promise.") (citations omitted).

The Trustee cites to *In re Galbreath*, 286 B.R. 185 (Bankr. S.D. Ga. 2002) in support of his argument that the Debtor's employment did not constitute value for the Guaranty. But *Galbreath* is factually distinguishable. In *Galbreath*, the court found that the debtor's execution of a $1.5 million note was unrelated to his later employment: "[the debtor] testified that [the company] never promised him or his wife a job if he would personally sign the note."[58] In addition, the debtor in *Galbreath* did not receive any consideration after signing the note: "Nothing further was paid at that point in time 'in exchange' for [the debtor's] signature."[59]

Thus, *Galbreath* is unlike the Debtor's case. But for the Debtor's Guaranty, Defendant would not have made the loans. And without Defendant's loans, there would be no ABC Club business venture, no employment for the Debtor, and no compensation of $20,000 per month.[60] For these reasons, the Court finds that the Debtor received a direct benefit of no less than $235,000 from the execution of the Guaranty in the form of employment and compensation.

    d.    <u>The Guaranty Enabled the Loan of $868,000 that the Debtor Used to Start Up and Operate the ABC Club Business Venture that the Debtor Thought Would be Worth Millions.</u>

For approximately nine months in 2010, the Debtor had anxiously attempted to pursue the business venture of selling supplemental insurance cards for services such as dental, vision, and prescriptions. The Debtor believed this business would be worth millions. However, by the latter part of 2010, the Debtor had run out of funding. The Debtor petitioned Defendant to loan $4 million to the American Benefits entities he was using for this venture. The Defendant declined to loan $4 million, but after much persuasion, Defendant agreed in early December 2010 to make loans for a

---

[58] 286 B.R. at 210.

[59] *Id*.

[60] The effective date of the Operating Agreement was December 6, 2010, and the Debtor received his first compensation payment of $10,000 on January 11, 2011, and a second $10,000 payment on January 27, 2011. Thereafter, the Debtor generally continued to receive bi-monthly compensation payments of $10,000 until September 2011.

new business, ABC Club, on the condition that the Debtor guaranty Defendant's loans up to $750,000. The parties further agreed that in exchange for such loans, the Defendant would have an 85% interest and the Debtor a 15% interest in ABC Club. The parties also agreed that the Debtor would run the company and receive a salary of $20,000 per month. Under the subsequently signed Operating Agreement, the Debtor was also entitled to receive an incentive of up to $500,000 from the sale of the first 500,000 insurance cards. Further, the Defendant offered the Debtor an additional 10% interest in ABC Club if it sold 1.8 million insurance cards within 18 months of the first shipment of cards.

These facts establish that in December 2010, the parties had determined that the potential profitability of the ABC Club business venture outweighed the associated risks because Defendant immediately began advancing substantial funds for use by ABC Club. [61] Indeed, by the end of January 2011, Defendant had loaned $278,000. By July 8, 2011, which was just before the $750,000 Transfer in payment of the Guaranty, Defendant's loans totaled $868,000. By the time of the last compensation payment to the Debtor on September 30, 2011, Defendant's loans totaled $1,058,050. And at the closing of the ABC Club business, the Defendant had loaned a grand total of $1,216,500. This establishes that even after the Debtor's departure, the Defendant viewed the ABC Club business venture as having a profit potential.

The parties memorialized the Guaranty in the Operating Agreement and stated their expectation that ABC Club "will make profits in its business in sufficient amount to repay in full the amounts loaned by [Defendant]." In the Guaranty, the Debtor also expressly acknowledged "the personal benefit [the Defendant's] organization and capitalization of the [ABC Club] has

---

[61] *See In re Fairchild Aircraft Corp.*, 6 F.3d 1119, 1126 (5th Cir. 1993) ("[W]e cannot use hindsight to recalibrate the risk–or the potential reward–of [the debtor's] investment.").

provided to [the Debtor] in the form of his employment by and promotional ownership interest in [ABC Club]."[62]

The value of the property transferred "must be determined at the time of the transfer without the benefit of hindsight."[63] But assessing the value of the newly-formed ABC Club without the benefit of hindsight is a challenge. However, the Debtor viewed the Defendant's loans as advances to him that he then advanced to ABC Club–in essence, the Debtor used the loans to invest in ABC Club.[64] Viewing the Debtor's liability under the Guaranty as his investment in ABC Club, the case law provides guidance as to how the Court should value the consideration received by the Debtor in exchange for the Guaranty–even though ABC Club ultimately failed to generate the anticipated profits.[65]

In *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L. (In re R.M.L.)*, 92 F.3d 139 (3d Cir. 1996), the Third Circuit answered the question of "how to determine whether an investment that failed to generate a positive return nevertheless conferred value on the debtor." The court observed that "[p]resumably the creditors whom § 548 was designed to protect want a debtor to take some risks that could generate value and, thus, allow it to meet its obligations without resort to protection under the Bankruptcy Code."[66] Therefore, "so long as there is some chance that a contemplated investment will generate a positive return at the time of the disputed

---

[62] ECF No. 113, Ex. 2 at § 6.7.

[63] *In re M. Fabrikant & Sons, Inc.*, 2009 Bankr. LEXIS 3606 at *39. *See also Redmond v. SpiritBank (In re Brooke Corp.)*, 541 B.R. 492 (Bankr. D. Kan. 2015) citing *Cooper v. Ashley Commc'ns., Inc. (In re Morris Commc'ns. NC, Inc.)*, 914 F.2d 458, 466 (4th Cir. 1990) (internal quotations omitted) ("The date for defining . . . reasonable equivalence is the date of the transfer.").

[64] ECF No. 113, Ex. 14, Dep. of Theodore William White, Jr. at p. 152-53.

[65] *In re Joy Recovery Tech. Corp.*, 286 B.R. 54, 75 (Bankr. N.D. Ill. 2002) (In assessing the value of a stock purchase, the "Courts will not look with hindsight at a transaction because such an approach could transform fraudulent conveyance law into an insurance policy for creditors.").

[66] *Id*. at 151.

transfer, we will find that value has been conferred."[67] The Circuit Court explained its rationale as follows:

> We think our analysis appropriately balances a creditor's interest in estate preservation against a debtor's legitimate, pre-bankruptcy efforts to take risks that, if successful, could generate significant value and, possibly, avoid the need for protection under the Code altogether. As we noted above, requiring that all investments yield a positive return in order to find that they conferred value on the debtor would be unduly restrictive. But so, too, would a rule insulating from § 548's coverage investments that, when made, have zero probability of success. The best solution, therefore, is to determine, based on the circumstances that existed at the time the investment was contemplated, whether there was any chance that the investment would generate a positive return. In this way creditors will be protected when an irresponsible debtor invests in a venture that is obviously doomed from the outset.[68]

In the case of ABC Club, there are no allegations or facts to suggest that at the time of its formation, ABC Club had "zero probability of success," was "obviously doomed from the outset," or that it was a sham or unreasonable investment.

The Trustee asserts that because the Debtor had been unsuccessful with this same business venture through the American Benefits entities that this evidences the inevitable failure of ABC Club. Further, the Trustee asserts that because the Debtor initially solicited a loan of $4 million, that this was the amount required to appropriately capitalize ABC Club. Thus, Defendant's loans of only $1.2 million doomed ABC Club to failure. The Court disagrees.

First, the Debtor testified, and there is no evidence to the contrary, that he had previously operated a similar business with success. Second, there is no evidence that ABC Club assumed any of the debts of the American Benefits entities, which explains why the Defendant would only invest in a new entity. Likewise, there is no evidence that the assets transferred to ABC Club were

---

[67] *Id*. at 152.

[68] *Id*.

subject to security interests in favor of the Defendant or other creditor. And even if they were, that is of no moment in assessing what the Debtor received in exchange for the Guaranty.

Further, there is no evidence as to what capital ABC Club needed to be successful, and the request for $4 million could as likely be explained as what the Debtor wanted rather than what ABC Club needed. The Court has asked the Trustee to come forward with all of the evidence to support his claim of inadequate consideration. But the facts referenced by the Trustee relate to the American Benefits entities, and they are untethered from the issue of what property interests the Debtor received and the value of such property resulting from the Guaranty.

Therefore, the Court finds that at the time of Guaranty in December 2010, the Debtor reasonably believed that his potential return on the ABC Club business venture would exceed his increasing liability under the Guaranty as the Defendant ultimately advanced funds in excess of $750,000. Based on this, the Court concludes that the value received by the Debtor in exchange for the Guaranty was at least equal to his liability thereunder.

This approach is in harmony with the case of *Allard v. Flamingo Hilton (In re Chomakos)*, 69 F.3d 769 (6th Cir. 1995), that provides a formula to quantify the value of a future investment for purposes of a fraudulent transfer action. In *Chomakos*, the trustee sought to recover the debtor's gambling losses as a constructively fraudulent transfer. The Sixth Circuit affirmed the bankruptcy court's finding that the debtor received reasonably equivalent value:

> [T]he placing of a bet gives rise to legally enforceable contract rights. These contract rights constitute "property," of course, and at the time which COLLIER identifies as "critical" – a time before anyone can know whether the bet will be successful – the property has economic value. The property is not unlike futures contracts purchased on margin. The investor in futures may win big, or his position may be wiped out, but the contractual right to a payoff if the market happens to

move the right way at the right time constitutes a value reasonably equivalent to the money at risk.[69]

In the present case, the dollar amount of the Debtor's investment in ABC Club was equal to his liability on the Guaranty, which was always only equal to the amount loaned by the Defendant, up to $750,000. When the Debtor paid the $750,000 Guaranty in July 2011 from his Judgment proceeds, the Defendant had advanced $868,000 for ABC Club. Following the logic of *Chomakos*, the Debtor's "money at risk" was his liability under the Guaranty. And his contractual right to a much larger payoff if the business succeeded "constitutes a value reasonably equivalent to the money at risk," or $750,000. Therefore, the Court finds that the Debtor received reasonably equivalent value of at least $750,000 in exchange for his liability under the Guaranty.

This logic is also consistent with the case of *Jimmy Swaggert Ministries v. Hayes (In Re Hannover Corp.)*, 310 F.3d 796, 802 (5th Cir. 2002) that involved the trustee's action to recover the price of options to purchase real property that were never exercised. The Fifth Circuit rejected the trustee's argument that the options ultimately proved to be without value:

> Like all speculative financial instruments, the value of an option can change over time, depending upon the value of the underlying property. This is their nature; options are bought and sold precisely to speculate on or hedge against market fluctuation. Without more, the fact that an option has become worthless in no way proves that it was worthless at an earlier date. Thus, consistent with economic reality, this and other circuits unequivocally hold that for purposes of § 548 the value of an investment, even a risky one, such as we have before us now, is to be determined at the time of purchase.[70]

In the Debtor's case, the ABC Club agreements gave him a 15% interest in the business he thought would be worth millions of dollars, a right to employment and a high salary (of which the Debtor received $235,000), a right to performance bonuses of up to $500,000 plus an additional

---

[69] *Id*. at 771.

[70] *Id*. at 802 (referencing *In re Fairchild Aircraft Corp.*, 6 F.3d at 1126–27 and *In re Chomakos*, 69 F.3d at 770).

10% ownership interest based on insurance card sales. Based on these facts, the Court finds that at the time of the Debtor gave the Guaranty, these contractual rights for considerable compensation constitute reasonably equivalent value that equals or exceeds the amount of the Debtor's liability under the Guaranty.

In support of his argument, the Trustee again cites to *In re Galbreath*, 286 B.R. 185 (Bankr. S.D. Ga. 2002) where the defendant in the avoidance action argued that the debtor received value for signing a note he hoped would return his business to profitability. But the court rejected that assertion because at the time of the note, the company had a negative net worth, its good will was "nominal at best," and for two years its cash flow had been insufficient to pay its ongoing obligations: "Under the circumstances, the opportunity to keep a hemorrhaging business on life support was simply not reasonably equivalent to $1.5 million."[71]

But these are not the circumstances of ABC Club. At the time of the Guaranty, it was a new business that the Debtor believed would be worth "millions of dollars" and that Defendant believed had sufficient potential to loan at least $750,000. There was no prior history evidencing that ABC Club was "on life support." On the contrary, the Debtor had experience in the insurance business in general and in selling supplemental insurance cards specifically.[72] The Debtor testified that prior to the formation of ABC Club, he had been working to develop the distribution network for the insurance cards, set up domain names, develop the software, establish contracts, and that all of these preparation were "rolled into" ABC Club.[73] Both parties believed that the profits from the ABC Club business would be more than sufficient to fully repay Defendant's loans. Finally, there has been no allegation that ABC Club was set up or operated as a fraud or sham organization.

---

[71] *Galbreath*, 268 B.R. at 211.

[72] ECF No. 113, Ex. 14, Dep. of Theodore William White, Jr., at p. 138. *See also* p. 39, 44, 48, 55-56, 128, and 130.

[73] *Id*. at 63 and 204.

And the Court's review of the ABC Club general ledger shows that it accounts for all credits, mostly from Defendant's loans, and all debits, with all of the expenses relating to legitimate business expenses. In other words, there is nothing to suggest that ABC Club business venture was doomed from the start, had zero probability of success, or was a sham business. For these reasons, the Court distinguishes *Galbreath* and rules that it cannot consider in hindsight the fact that ABC Club did not generate the profits the parties anticipated at the time of their December 2010 agreements that included the Guaranty.

Therefore, the best evidence, indeed the only evidence at the time of the Guaranty, is that both parties viewed the potential financial rewards of the ABC Club business venture to be far greater than the accompanying risks of their investments. And their agreements and subsequent conduct are completely consistent with these initial views regarding the potential value of the ABC Club business venture. As a result, the Defendant was willing to loan funds to ABC Club and the Debtor was willing to guaranty such funds up to $750,000. The Debtor mitigated his risk by taking charge of business operations and paying himself a salary of $20,000 per month that resulted in $235,000 in actual compensation. And while the Debtor had to accept a 15% interest in the business, he procured a contractual right to a performance bonus of up to $500,000 along with an offer from Defendant to increase the Debtor's ownership interest from 15% to 25% based on performance.

Based on these facts, the Court finds that at the time the Debtor agreed to guaranty the repayment of Defendant's loans up to $750,000, the Debtor received reasonably equivalent value that was equal to or greater than the liability he assumed under the Guaranty.

## IV. CONCLUSION

Based on the arguments and undisputed facts in the motions, the Court finds no genuine issue of material fact that the Debtor received reasonably equivalent value in exchange for his guaranty of Wardley's loans to ABC Club.[74] Thus, the Trustee's second cause of action is now resolved and will be dismissed pursuant to a contemporaneous Order.

The Court must comment on the excessive expenditure of time and resources resulting from the Trustee's piece-meal litigation of this Adversary Proceeding. The Trustee filed the complaint on May 30, 2016, so it has now been pending over five years. The Court has ruled on three prior motions for summary judgment—one by the Defendant and two by the Trustee. This is now the Trustee's third motion for summary judgment and yet the proceeding is still not fully resolved. Adding to the Court's concern is that it has twice had to enter Orders to Show Cause against the Trustee as to why this proceeding should not be dismissed for lack of prosecution.[75] At this juncture, and in an effort to bring this proceeding to a final conclusion, the Court will not entertain further dispositive motions. It is time for the Trustee to try, settle, or dismiss this proceeding. Therefore, the Court will enter an order setting a final pretrial conference and deadline for the parties to file a completed stipulated pretrial order for the Court's consideration at the final pretrial conference. At the conference the Court intends to set trial dates.

---

[74] As the Defendant notes, when one party moves for summary judgment, courts may grant summary judgment in favor of the opposing party on the issues raised by the movant without requiring a cross-motion for summary judgment. *See Dickeson v. Quarberg*, 844 F.2d 1435, 1444 n. 8 (10th Cir. 1988).

[75] ECF No. 80 on October 10, 2018, and ECF No. 103 on February 5, 2021.

_____ooo0ooo_____

## DESIGNATION OF PARTIES TO RECEIVE NOTICE

Service of the foregoing MEMORANDUM DECISION shall be served to the parties and in the manner designated below.

**By Electronic Service:** I certify that the parties of record in this case as identified below, are registered CM/ECF users:

- Adam S. Affleck    adam-affleck@rbmn.com, andalin-bachman@rbmn.com;affleckar93359@notify.bestcase.com;jennifer-franklin@rbmn.com
- Troy J. Aramburu    taramburu@swlaw.com, jritchie@swlaw.com,docket_slc@swlaw.com,awayne@swlaw.com
- Bret R Evans    brevans@swlaw.com, jritchie@swlaw.com,docket_slc@swlaw.com,awayne@swlaw.com
- Tessa Meyer Santiago    tessameyersantiago@gmail.com, lincolnlaw.tms@gmail.com

**By U.S. Mail:** In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

None.